1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

12  KEVIN M. KESTNER                              No. C 13-04747 LB

13          Plaintiff,

                                                 **ORDER GRANTING IN PART AND**
14      v.                                        **DENYING IN PART PLAINTIFF'S**
                                                  **MOTION FOR SUMMARY JUDGMENT**
15  CAROLYN W. COLVIN,                            **AND DENYING DEFENDANT'S**
    Acting Commissioner of Social Security,       **CROSS-MOTION FOR SUMMARY**
16                                                **JUDGMENT**
            Defendant.
17                                                **[Re: ECF Nos. 14, 19]**

18  _____/

19                                **INTRODUCTION**

20      Plaintiff Kevin Kestner moves for summary judgment against the acting Commissioner of Social

21  Security, seeking judicial review of the Commissioner's final decision denying his claims for

22  supplemental social security income and disability insurance benefits. *See* Motion, ECF No. 14.[1]

23  The Administrative Law Judge ("ALJ") found that although Mr. Kestner had severe impairments,

24  his impairments did not meet or medically equal any listed impairments, and further, that his

25  residual functional capacity ("RFC") would not allow him to return to previous work, but would

26  _____

27      [1] Citations are to the Electronic Case File ("ECF") with pin cites to the ECF-generated page
28  numbers at the top of the document.

C 13-04747 LB
ORDER

UNITED STATES DISTRICT COURT
For the Northern District of California

1    allow him to adapt to new employment as an assembler or table worker.  AR 30.[2]  Based on those

2    findings, the ALJ denied his application for benefits.  AR 31.

3        Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision by this court

4    without oral argument.  All parties have consented to the court's jurisdiction.  Consent (Plaintiff),

5    ECF No. 7; Consent (Defendant), ECF No. 11.  Based on the ALJ's errors and unsubstantiated

6    conclusions, the undersigned **GRANTS IN PART** and **DENIES IN PART** Mr. Kestner's motion

7    for summary judgment, **DENIES** the Commissioner's cross-motion for summary judgment, and

8    **REMANDS** for the immediate award of benefits because Mr. Kestner was disabled from January 2,

9    2009 to June 12, 2011 and additional administrative proceedings would serve no purpose.

10                                                **STATEMENT**

11   **I.  PROCEDURAL HISTORY**

12       Mr. Kestner, now 28, applied for DIB and SSI on April 5, 2010.  Application for SSI, AR 132-

13   136; Application for DIB, AR 137-143.  He alleged disability beginning January 1, 2009[3] due to

14   epilepsy and anxiety disorder.  AR 21, 132, 137.  The Commissioner denied his application both

15   initially in November 2010 and upon reconsideration in March 2011.  Initial Denial, AR 77-81;

16   Denial upon Reconsideration, AR 83-87.  In May 2011, Mr. Kestner timely requested a hearing

17   before an ALJ.  AR 88-89.

18       The Commissioner granted Mr. Kestner's request and on March 15, 2012, ALJ Timothy G.

19   Stueve held a hearing in Oakland, California.  AR 37-72.  Mr. Kestner appeared with his attorney at

20   the time, Barbara Mann.  Mr. Kestner's father, Mike Kestner, and vocational expert Alan Nelson

21   also appeared and testified.  *Id.*  In April 2012, the ALJ found that Mr. Kestner was not disabled,

22   therefore denying him DIB and SSI.  *See* AR 16-31.

23       In May 2012, Mr. Kestner appealed the ALJ's decision to the Social Security Appeals Council.

24

25

26   _____

     [2]  Citations are to the Administrative Record ("AR") with pin cites to the page numbers at the bottom of the document.

27   [3]  Mr. Kestner originally claimed an onset date of April 1, 2010.  AR 132, 137.  His attorney

28   later amended his claimed onset date to January 1, 2009.  AR 21, 240.

1   AR 14-15.  In May 2013, the Appeals Council denied Mr. Kestner's request for review, at which

2   point the Commissioner's decision became final.  AR 7-10.  In October 2013, Mr. Kestner timely

3   sought judicial review under 42 U.S.C. § 405(g).  Complaint, EFC No. 1.  Both parties have now

4   moved for summary judgment.  Motion, ECF No. 24; Cross-Motion, ECF No. 26.

5   **II.  SUMMARY OF RECORDS AND ADMINISTRATIVE FINDINGS**

6       This section summarizes (A) the documentary evidence in the administrative record; (B) the

7   vocational expert's testimony; (C) testimony from claimant and his father; and (D) the ALJ's

8   findings.

9       **A.  Documentary Evidence**

10          ***1.  Dr. Wengang Zhang (May 1, 2009 to  September 14, 2010***

11      Dr. Wengang Zhang, an Internist at Springhill Medical Group, treated Mr. Kestner from May

12  2009 to September 2010.  AR 245-62, 329-44, 429-92, 546-48, 568.  Mr. Kestner attended

13  scheduled appointments on May 1, 2009; July 1, 2009; November 30, 2009; June 15, 2010; July 13,

14  2010; and September 14, 2010.  AR 329-37, 464-48, 546-48.  He also saw Dr. Zhang for urgent care

15  appointments on February 23, 2010 and March 8, 2010.  AR 338-43.

16      At his first appointment on May 1, 2009, Mr. Kestner reported weight gain, panic attacks, stress,

17  depression, acne, and accidentally dropping things from his hands.  AR 329-30.  He denied any

18  history of intravenous drug abuse and claimed that he had not used cigarettes or alcohol for over two

19  years.  *Id.*  Finally, he indicated that he had suffered from seizures in the past.  *Id.*  Dr. Zhang

20  diagnosed Mr. Kestner with Generalized Anxiety Disorder and prescribed Diazepam.  AR 330.  To

21  address Mr. Kestner's acne, Dr. Zhang referred him to a dermatologist.  *Id.*  Dr. Zhang also advised

22  Mr. Kestner to adopt a low cholesterol and low sodium diet.  AR 331.  On July 2, 2009, Mr. Kestner

23  reported that he had lost weight and that his anxiety had improved while taking Diazepam.  AR 332.

24  On November 30, 2009, Mr. Kestner reported that he "reacted badly" once he ended his trial period

25  of Diazepam.  AR 335.  At this and all subsequent appointments with Dr. Zhang, Mr. Kestner

26  indicated that he was "perform[ing] well [at] his job."  *Id.*  Dr. Zhang instructed Mr. Kestner to

27  return for a follow-up appointment after six months.  AR 337.

28      At an urgent care appointment on February 23, 2010, Mr. Kestner reported experiencing two

UNITED STATES DISTRICT COURT
For the Northern District of California

seizure-like episodes. AR 338. The first seizure had occurred one week prior, and Ms. Kestner's wife had observed it. *Id.* The seizure involved one minute of body shaking, tongue biting, and lack of verbal functioning followed by a fifteen minute lapse of consciousness. *Id.* Mr. Kestner indicated that he had suffered a "similar episode" two hours prior to the appointment and complained of neck pain and stiffness. *Id.* Although Dr. Zhang suggested visiting the ER to rule out a seizure, Mr. Kestner instead opted for an outpatient examination instead. AR 339. Dr. Zhang also told Mr. Kestner that he should not drive until the doctors had ruled out seizures.[4] *Id.*

On February 25, 2010, Dr. Zhang referred Mr. Kestner to Dr. Angelita Tangco for a neurological evaluation regarding his seizures. AR 340. At another urgent care appointment on March 8, 2010, Mr. Kestner reported developing a "red rash and itching." AR 342. Attributing these symptoms to Mr. Kestner's seizure medication, Dr. Zhang took him off Keppra and suggested that Mr. Kestner see a psychologist and neurologist. AR 343. At a follow-up appointment on June 15, 2010, Mr. Kestner reported having a seizure two days prior. AR 466. He also reported that he was receiving neurological therapy and evaluation. *Id.* Finally, he said that he was not driving. *Id.* At his next appointment on July 13, 2010, Mr. Kestner reported having a seizure two weeks prior. AR 464. He also reported he was under stress and that he had recently separated from his wife. *Id.* Finally, Mr. Kestner told Dr. Zhang that he could not seek psychiatric treatment because it was too expensive. *Id.*

Dr. Zhang recommended that he undergo an EEG[5] and follow-up with his neurologist. *Id.* Dr.

---

[4] Dr. Zhang noted the following: "Pt should [sic] drive until r/o seizure." *Id.*

[5] An electroencephalogram (EEG) is a test that detects electrical activity in your brain using small, flat metal discs (electrodes) attached to your scalp. Your brain cells communicate via electrical impulses and are active all the time, even when you're asleep. This activity shows up as wavy lines on an EEG recording. An EEG is one of the main diagnostic tests for epilepsy. An EEG may also play a role in diagnosing other brain disorders.

*EEG Definition*, Mayo Clinic, http://www.mayoclinic.org/tests-procedures/mri/basics/definition/prc-20012903 (last visited August 5, 2014).

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Zhang also indicated that Mr. Kestner was intolerant of "Seroqual and Trileptal."  *Id.*  At his last

2    appointment with Dr. Zhang on September 14, 2010, Mr. Kestner reported that he continued to

3    suffer from seizures, including one which he experienced during an MRI.[6]  AR 546.  Dr. Zhang

4    noted Mr. Kestner's EEG results were abnormal and that he was under neurological therapy.  *Id.*

5           ***2. Dr. Angelita Tangco from April 2, 2010 to August 4, 2010***

6        Angelita Tangco, a Neurologist at Springhill Medical Group, saw Mr. Kestner on April 2, 2010;

7    June 15, 2010; and August 4, 2010.  AR 345, 369, 462.

8        On the initial visit form for his 4/2/10 appointment, Mr. Kestner indicated that he had

9    experienced "multiple seizures" and that he had visited the emergency room after those episodes.

10   AR 397.  Concerning his family history, Mr. Kestner noted that his mother and brother had suffered

11   from seizures or convulsions.  *Id.*  Lastly, regarding his neurological and trauma symptoms, Mr.

12   Kestner reported falls, blackouts, convulsions, confusion, dizziness, balance problems, and problems

13   with speech.  AR 399.

14       On April 2, 2010, Dr. Tangco evaluated Mr. Kestner for a neurological consultation concerning

15   his seizures.  AR 345-51.  Mr. Kestner reported experiencing a "jerking movement" when he was

16   seventeen years old.  AR 345.  Since then, he has had "4-5 episodes where he has become clonic,

17   followed by tonic-clonic movements with amnesia of the event."[7]  *Id.*  He also reported that his wife

18

19           [6]  Mr. Kestner had also seen Dr. Zhang on July 27, 2010 for an urgent care appointment due
     to a motorcycle accident four days prior where he had struck his forehead without a helmet.  AR
20   554.  His reported symptoms included dizziness, blurred vision, nausea, and vomiting.  *Id.*  Dr.
     Zhang found no skull fractures or intercranial hemorrhaging.  *Id.*
21

22           [7]       A grand mal seizure — also known as a generalized tonic-clonic seizure — features a
                 loss of consciousness and violent muscle contractions.  It's the type of seizure most
23               people picture when they think about seizures in general.  Grand mal seizure is
                 caused by abnormal electrical activity throughout the brain.  Most of the time grand
24               mal seizure is caused by epilepsy.  In some cases, however, this type of seizure is
                 triggered by other health problems, such as extremely low blood sugar, high fever or
25               a stroke.  Many people who have a grand mal seizure will never have another one.
                 However, some people need daily anti-seizure medications to control and prevent
26               future grand mal seizure.
27
                 *Grand Mal seizure: Definition*, Mayo Clinic,
28

1    witnessed one of these events, which happened while he was sleeping.  *Id.*  As noted by Dr. Tangco,

2    "[Ms. Kestner] said she just heard him starting to moan and then he became tonic-clonic and

3    apparently after a few minutes this spontaneously stopped, the patient got up, walked around.  After

4    this, the patient had no recollection of this event."  *Id.*  Finally, Mr. Kestner reported having

5    episodes where he has bitten his tongue.  *Id.*  Dr. Tangco also noted that "[Mr. Kestner] was started

6    on Keppra, however, he apparently had blisters on it.  This was discontinued and he is on Trileptal.

7    The patient takes Trileptal 300mg twice a day.  He no longer has the tonic-clonic events, however,

8    he continues to have the jerking episodes."  AR 345-46.

9        With respect to his social history, Mr. Kestner admitted a history of "significant polysubstance

10   abuse" in that "[h]e used to do marijuana, cocaine, and other medications, but denie[d] IV drug use."

11   AR 346.  He claimed, however, that he had not taken any recreational drugs since 2007.  *Id.*  Mr.

12   Kestner also reported that although "[h]e used to be a significantly heavy drinker," he had

13   "significantly cut down in the last six months."[8]  *Id.*  Regarding his affect, Dr. Tangco noted that Mr.

14   Kestner was "mildly excitable, nervous, and at the same time a little apprehensive."  AR 349.

15       Dr. Tangco diagnosed him with juvenile myoclonic epilepsy, peripheral neuropathy, and anxiety

16   disorder.  AR 350.  She ordered an EEG for him under sleep deprivation and an "MRI of the brain

17   using a seizure protocol with contrast."  *Id.*  She also ordered blood serum tests to investigate the

18   cause of Mr. Kestner's neuropathy.  *Id.*  Finally, Dr. Tangco prescribed him Depakote for his

19   seizures at increasing dosages as needed.  *Id.*

20       At his follow up appointment on June 15, 2010, Mr. Kestner complained that he had six seizures

21   since taking Depakote, compared to only three per year on Trileptal.  AR 369.  He also reported

22   headaches, blackouts, and convulsions.  AR 410.  In response, Dr. Tangco switched his medication

23   from Depakote back to Trileptal, now at a higher daily dose of 150 mg.  AR 369.  They also

24

25   _____

26   http://www.mayoclinic.org/diseases-conditions/grand-mal-seizure/basics/definition/con-2002
     1356, (last visited August 4, 2014).

27       [8]  At the time, Mr. Kestner reported that he drank one alcoholic beverage per day and five or

28   six each week.  AR 398.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   discussed the importance of a "regular, disciplined life style to prevent seizure breakthroughs." *Id.*

2   As Mr. Kestner had not followed up on his EEG or MRI, Dr. Tangco reordered those tests. *Id.*

3   ### 3. Mr. Kestner's Function Report

4   On June 26, 2010, Mr. Kestner filled out a Social Security Administration Function Report Form

5   regarding his abilities. *See* AR 191.  He indicated that a normal day consisted of eating breakfast,

6   taking medication, showering, doing some cleaning, waiting for his wife and son to come home,

7   then eating dinner and going to bed. *Id.*  Other than that, he said there was "[n]ot much I can do I

8   live with fear of having a seizure.  I don't want to get hurt or hurt anyone.  Also I don't have a

9   drivers license, the doctor and DMV took it d[ue] to the seizures!" AR 191.  Mr. Kestner explained

10  that he sometimes took care of his son, but due to the circumstances, he was "very rarely" at home

11  alone with him.  AR 192.

12  While Mr. Kestner previously was able to drive to work and hold a steady job, he was not longer

13  able to do so. *Id.*  He reported having two seizures in the shower. *Id.*  As a result, he needed to

14  shower with the bathroom door open because he almost drowned after having a seizure in the bath.

15  *Id.*  Mr. Kestner wrote that he can not cut meat or use a knife, could not swim, drive, ride a bike, use

16  sharp objects and "its not a good idea for me to watch my son by myself!" *Id.*

17  He explained that he was not able to work because of his seizures, so he could not pay bills.

18  AR 194.  In addition, his ability to do most physical activities was affected because he had seizures.

19  *See* AR 196.  He indicated that he did not follow written or spoken instructions well and did not get

20  along with authority figures. *See* AR 196-97.  Finally, he did not handle stress well and wrote that

21  changes to his routine could cause seizures.  AR 197.

22  ### 4. Adrianna Kestner's Third-Party Function Report

23  On July 6, 2010, Adrianna Kestner, then Mr. Kestner's wife, signed a third party function report

24  regarding Mr. Kestner's disabilities.  AR 183.  At the time of writing, she had known Mr. Kestner

25  for 10 years.  AR 183.  She lived with Mr. Kestner and spent more than 12 hours a day with him. *Id.*

26  She noted that Mr. Kestner's daily activities included eating breakfast, taking medication,

27  showering, cleaning the house, eating lunch, resting and relaxing, eating dinner, and going to sleep.

28  *Id.*  Mr. Kestner took care for their son, along with Ms. Kestner, another family member, and a

UNITED STATES DISTRICT COURT
For the Northern District of California

1  daycare provider.  AR 184; *see* AR 192 (identifying person named in Ms. Kestner's report as a

2  family member).

3      Since the onset of Mr. Kestner's disability, he could no longer "drive, work, work out/exercise,

4  be alone w/his son, take showers alone."  *Id.*  While he could dress and groom himself, Mr. Kestner

5  "could not be alone in the shower or bath, or use sharp instruments such as razor without

6  supervision."  *Id.*  He needed reminders to take his medication.  AR 185.  He also could walk or ride

7  in a car but he could not drive or go shopping alone because he may have a seizure without warning.

8  AR 186.  Mr. Kestner's hobbies included reading and watching TV, though he could not do weight

9  training anymore because of his seizures.  AR 187.

10     Ms. Kestner reported that Mr. Kestner's medical problems affected all the listed physical

11 activities except "sitting" and "getting along with others."  AR 188.  This is because "he can and has

12 had a s[ei]zure while doing most activities – When he has a s[ei]zure he has trouble talking, hearing,

13 understanding, seeing – his memory is permanently affected."  AR 188.  The third party function

14 form asked how well Mr. Kestner followed written and spoken instructions, got along with authority

15 figures, and handled stress.  *See* AR 189.  In each case, Ms. Kestner responded, "Not Well."  *Id.*  He

16 also "handled changes in routine" "very poorly."  AR 189.

17     In the remarks section of the report, Ms. Kestner summarized the situation as follows:

18     Kevin's s[ei]zures have severely affected his everyday life; he cannot go anywhere or do
       anything alone.  Kevin must be accompanied and cared for at all times because he can have a
19     s[ei]zure at any time without warning.  Kevin was very active and physically fit before he got
       this condition, now he cannot do any of those things."

20

21 AR 190.

22     ### 5. *August 3, 2010 MRI*

23     On August 3, 2010, radiologist Dr. Stephen Hesseltine examined Mr. Kestner using an MRI.

24 *See* AR 458, 570-71.  During the examination, Mr. Kestner had a seizure.  *Id.*  Dr. Hesseltine

25 terminated the exam and the paramedics were called.  *Id.*  While some of the images were of

26 diagnostic quality, Dr. Hesseltine suggested Mr. Kestner might need to return for further imaging.

27 *Id.*

28     The next day, on August 4, 2010, Mr. Kestner complained to Dr. Tangco that his libido had

UNITED STATES DISTRICT COURT
For the Northern District of California

1  plummeted on Depakote and he was not going to put up with that.  AR 462.  He also said that "he

2  really does not care whether he is treated or not" and he put the "burden of choice of therapy and

3  medication on his wife."  AR 462.  He also requested a 24/7 care giver "to look after him when he

4  has his spells and make[] sure he takes his medication."  *Id.*  Dr. Tangco told Mr. Kestner that at

5  twenty-four years old, he needed to learn to take care of himself.  *Id.*  She also switched him from

6  Depakote to Topamax pending further evaluation.  *Id.*  On August 11, 2010, Dr. Tangco referred Mr.

7  Kestner to the UCSF Epilepsy Center for specialized seizure treatment.  AR 562.

8  ### 6.  August 13, 2010 EEG

9  On August 13, 2010, Mr. Kestner underwent an EEG at the Neurology Medical Group of Diablo

10  Valley, Inc.  AR 579.  The attending physician, Dr. Janet Lin, interpreted the readings as

11  "abnormal," specifically stating that "[t]his is an abnormal awake and drowsy EEG due to the

12  presence of generalized epileptogenic potentials."  *Id.*

13  On August 30, 2010, Mr. Kestner called Springhill Medical Group to report that he had

14  "developed hives after starting Topamax."  AR 439.  Through Mr. Kestner's wife, Dr. Tangco

15  communicated that he needed to go to the ER because "[t]his may be early signs of anaphylaxis."

16  AR 434.

17  ### 7.  Dr. C. Eskander on August 24, 2010

18  On August 24, 2010, agency medical consultant Dr. Eskander conducted a physical RFC

19  assessment of Mr. Kestner.  *See* AR 415-19.  First, Dr. Eskander noted that the evidence established

20  Mr. Kestner had no extertional limitations.  AR 416.  Second, he indicated that while Mr. Kestner

21  could frequently[9] climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, he could never

22  climb ropes, ladders, or scaffolds.  AR 417.  Third, he found that the evidence established Mr.

23  Kestner had no manipulative, visual, or communicative limitations.  AR 417-18.  Fourth, he

24  concluded that Mr. Kestner had no environmental limitations, except that he should avoid even

25  moderate exposure to hazards, such as machinery or heights.  AR 418.  Regarding postural and

26  

27  _____

28  [9]  Form SSA-4734-BK defines "frequently" as "occurring one-third to two-thirds of an 8-hour workday (cumulative, not continuous)."  AR 415.

1   environmental limitations, the form requires the medical consultant to "cite the specific facts upon

2   which your conclusions are based." AR 417-18. Dr. Eskander provided no explanation to support

3   his conclusions concerning Mr. Kestner's limitations. *Id.*

4       With respect to Mr. Kestner's alleged symptoms, Dr. Eskander indicated that they were

5   "attributable, in [his] judgment, to a medically determinable impairment" and that "the severity or

6   duration of the symptom(s), in [his] judgment, is disproportionate to the expected severity or

7   expected duration [based on the claimant's impairment]." AR 418. He further noted that the

8   medical evidence reflected significant non-compliance. *Id.* Dr. Eskander also indicated the treating

9   and examining source statements were on file and that his findings did not vary significantly from

10  them. AR 419. Finally, he cites treating physician Dr. Tangco's April 2010 notes as the basis for

11  his conclusion about Mr. Kestner's environmental limitations. *See id.* ("4/10 TP MSS FOR ENV.

12  LIMITATIONS FOR SZ D/O").

13              ***8. Dr. Jacklyn Chandler on August 26, 2010***

14      On August 26, 2010, psychological assistant Jacklyn Chandler, Ph.D., conducted a

15  "psychological mental status disability evaluation" of Mr. Kestner. AR 420-24.

16       Concerning his present illness, Mr. Kestner reported "a history of epilepsy since the age of 16"

17  and that "he was finally diagnosed with epilepsy in early 2009." AR 422. He also claimed that "his

18  seizures ha[d] increased and in the past 25 days, he . . . had 9 or 10 seizures. He stated that he has

19  both petit-mal and grand-mal seizures with the same frequency." *Id.* Finally, Mr. Kestner "reported

20  symptoms characteristic of anxiety, including tension, excessive worry, nervousness, fearfulness,

21  and irritability and difficulty sleeping." *Id.*

22      Mr. Kestner told Dr. Chandler that he "last worked for 4 months as an office clerk" but was "laid

23  off in December 2008 due to lack of work" and that he had "also worked as a cashier for 2 years."

24  AR 423. He also reported that he had "taken Diazepam for anxiety since 2009" but stopped his

25  medication due to adverse effects. *Id.* In addition, Mr. Kestner "denied any history of drug or

26  alcohol abuse." *Id.* Lastly, with respect to his daily living activities, he reported that while he was

27  "unable to take the bus by himself" or "drive a car," he was "able to do simple household chores

28  such as washing dishes, doing laundry, and preparing simple meals." *Id.* He also reported that he

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

1    was "able to go grocery shopping unattended" and "dress and groom himself." *Id.*

2       Dr. Chandler observed that although Mr. Kestner was "alert and oriented" and spoke clearly and

3    coherently, his mood was "anxious" and "[h]e appeared worried about his seizures." *Id.* Dr.

4    Chandler administered one formal test, the Folstein Mini Mental State Exam.[10] AR 423. Mr.

5    Kestner scored 28 out of 30, which she characterized as "a valid reflection of the claimant's current

6    level of functioning" in the "normal range." *Id.*

7       Dr. Chandler prefaced her final assessment by stating "that the present evaluation was limited in

8    scope. It was based on only one session of client contact, in a structured environment, with pre-

9    authorized tests. Background and correlative information was considered to be limited." AR 424.

10   She also remarked that "[Mr. Kestner] appeared to meet criteria for a DSM-IV-TR diagnosis of

11   Anxiety Disorder due to Epilepsy With Generalized Anxiety and Panic Attacks." *Id.* She further

12   noted that Mr. Kestner's "psychiatric symptoms appear to be only partially controlled by

13   medication," that he had "moderate difficulty enduring the stress of the interview" and "mild

14   difficulty interacting appropriately" with Dr. Chandler. *Id.* Finally, Dr. Chandler found that

15   "[b]ased upon observations of current behavior and reported psychiatric history, [Mr. Kestner's]

16   ability to interact with the public, supervisors, and coworkers appears to be moderately impaired."

17   *Id.*

18          ***9.  UCSF Epilepsy Center and Dr. Tina Shih in September 2010***

19       In September 2010, neurologist and epilepsy specialist Dr. Tina Shih saw Mr. Kestner for his

20   initial appointment at the UCSF Epilepsy Center. AR 426-28. He was "accompanied by his father

21   and his wife who provided some corroborating history." AR 426. Dr. Shih noted that his seizures

22   fell into two categories, namely "myoclonus" and "convulsive seizures," which she described as

23   follows:

24       1. Myoclonus: these are characterized by a sudden twitch or jerk of his body or limb and

25   

26          [10] "The [Mini Mental State Exam] is a collection of questions that test various cognitive
     domains including orientation to time and place, repetition, verbal recall, attention and calculation,
27   language and visual construction." *The Mini Mental State Examination*, Practical Neurology,
     http://pn.bmj.com/content/5/5/298.abstract (last visited July 30, 2014).
28

UNITED STATES DISTRICT COURT
For the Northern District of California

1  can occur at any time of day (father seems to think they also occur at night).  The involuntary

2  movement can be severe enough to cause him to drop things of force to the ground and can

3  occur in isolation.  There are days where he can experience repetitive myoclonus, occurring
   every few minutes and this can last for hours.  Typically, these are occurring every other day.

4  2. Convulsive Seizures.  These can be preceded by repetitive myoclonus or can occur
   without much warning.  His family members describe symmetric flexion of the arms, an ictal

5  cry, a look of fear, then generalized stiffness and then shaking without any lateralizing
   features.  This can last for 1-2 minutes, result in tongue biting and self injury (head trauma,

6  abrasions, broken nose).  In July, he had 2 convulsions.  In August, he reported 15
   convulsions and in September, he has had one convulsion last week.  Isolated aura

7  characterized by an indescribable sensation lasting 15-20 seconds.

8  *Id.*  As reported by Mr. Kestner and his family, "[h]e had a convulsion at age 16, then at age 18 and

9  was convulsion-free on no anticonvulsants from 19-23."  *Id.*  Mr. Kestner's seizures then "increased

10  in frequency and severity" starting in February 2010.  *Id.*

11  Investigating his history of prescriptions, Dr. Shih found that Mr. Kestner had been on a variety

12  of anticonvulsants and other medication.  AR 427.

13  I called Target in Pittsburgh to review his medications as [Mr. Kestner] and his wife were not
   sure of the prior trials or the doses.  He's had prescriptions for Depakote ER 500 mg 2 tablets

14  twice a day, but he filled this only once in April 2010.  He claims this resulted in intolerable
   sexual side effects.  He had a prescription for Trileptal 150 mg tablets (2 in the morning, 1 at

15  night) and this was filled twice (April and July).  Prescription for Diazepam for past 2 years.
   Prescription for Topiramate 25 mg filled once in August.  [Mr. Kestner] said he had trials with

16  Topiramate and Keppra both of which resulted in rash.

17  *Id.*  Dr. Shih also indicated that Mr. Kestner was allergic to Keppra, Topamax, and vicodin, all of

18  which gave him a rash or hives.  *Id.*  Dr. Shih also said that according to Mr. Kestner, his EEG was

19  "reportedly normal," although she admitted that "[she] did not have the this report available to

20  [her]."  *Id.*; *but see* AR 579 (Dr. Janet Lin reporting abnormal EEG readings).

21  Dr. Shih diagnosed him with "[p]robable primary generalized epilepsy/juvenile myoclonic

22  epilepsy" and explained to him that "the first line medications are typically Divalproex sodium,

23  topiramate, lamotrigine, zonisamide, and levetiracetam."  AR 427-28.  Dr. Shih then ruled out

24  topiramate and levetiracetam due to Mr. Kestner's adverse reaction to them.  AR 428.  Although Dr.

25  Shih explained that divalproex tended to be the most effective medication for his type of epilepsy,

26  Mr. Kestner did not want to try it again, even at lower doses.  *Id.*  Mr. Kestner did not want to try

27  any medications but agreed to a low dose of zonisamide at his family's request.  *Id.*  Dr. Shih

28  considered the dosage to be subtherapeutic, but let Mr. Kestner start with the lower dose because of

1    his claimed sensitivity to medication.  AR 428.  Concluding, Dr. Shih said Mr. Kestner understood

2    he "cannot begin driving again until he is free of disabling seizures."  AR 428.

3            ***10. Dr. R. Paxton on October 5, 2010.***

4        On October 5, 2010, Dr. R. Paxton, a state agency psychological consultant, assessed Mr.

5    Kestner's mental residual functional capacity.  AR 580-596; *see also* ALJ Decision, AR 28.  On the

6    form, Dr. Paxton indicated that Mr. Kestner had an affective disorder.  AR 582.  Dr. Paxton further

7    indicated that Mr. Kestner had a "medically determinable impairment" substantiated by "pertinent

8    symptoms, signs, and laboratory findings."  AR 583.  For the paragraph B criteria, Dr. Paxton found

9    a mild degree of limitation in regards to restriction of activities of daily living, difficulties in

10   maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace,

11   and that Mr. Kestner would suffer one or two repeated episodes of decompensation of extended

12   duration.  AR 588.[11]  Dr. Paxton found that Mr. Kestner had moderately limited abilities to (1)

13   understand and remember detailed instructions, (2) carry out detailed instructions, and (3) interact

14   appropriately with the general public.  AR 591-92.  Otherwise, Mr. Kestner's ability to perform any

15   of the other listed mental functions was not significantly limited.  *Id.*  Dr. Paxton concluded that Mr.

16   Kestner had "the capacity to do simple level work at two hour intervals in a non public setting.

17   Concentrative capacity is sufficient.  Adaptive capacity is also sufficient."  AR 593.

18       In the case analysis, Dr. Paxton noted that there were no inconsistencies between reports and

19   allegations.  AR 595.  In assessing credibility, Dr. Paxton noted "Partially credible.  Seizures and

20   panic attacks."  *Id.*

21           ***11. Mr. Kestner's Seizure Questionnaire***

22       On November 1, 2010, Mr. Kestner filled out a questionnaire providing details about his

23   seizures.  *See* AR 199-201.  On the form he indicated that he has been having seizures since

24   February 10, 2010 and had them "at least ever[y] 1 to 2 weeks.  AR 199.  His last four seizures were

25   on September 20, October 8, 14, and 25.  *Id.*  They lasted two to five minutes, during which time he

26

27           [11] At minimum, a marked degree of limitation or three repeated episodes of decompensation

28   satisfy the functional criteria.  AR 588.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   lost consciousness, had convulsions, and bit his tongue.  *Id.*  Afterwards, he felt "like [he] got beat

2   up and no energy."  *Id.*  This lasted for 30-45 minutes, but it took about 24 hours for him to get his

3   energy back.  *Id.*  At the time of writing, he had been taking divalproex for about three weeks and

4   diazepam for about two years, and reported that he always took his medications.  AR 200.

5   ### 12.  *Seizure at John Muir Medical Center (Concord) on November 17, 2010*

6   On November 4, 2010, Mr. Kestner had a seizure while he was with a friend who was being seen

7   in the emergency department at John Muir Medical Center in Concord, CA.  AR 597-608.

8   Emergency Medical specialist, Dr. Ryan Romeiser noted that Mr. Kestner's friend witnessed the

9   seizure and that according to the friend, Mr. Kestner's "body tensed up and convulsed for a short

10  period of time, approximately several minutes, and then stopped.  The patient was then postictal for

11  a short period and says he feels fine now and has no complaints."  AR 601.  Dr. Romeiser noted that

12  Mr. Kestner was "positive for seizure."  AR 602.

13  Mr. Kestner reported that he was taking Valium and 250 mg of Depakote twice daily, but had

14  missed his morning dose.  AR 602.  Mr. Kestner was given 500 mg of Valproate orally and did not

15  experience any further seizures at John Muir.  AR 603.  Dr. Romeiser opined that Mr. Kestner's

16  episode could have been caused by a breakthrough seizure, medical noncompliance, subtherapeutic

17  levels of Depakote, infection, or electrolyte abnormality.  *Id.*

18  Dr. Romeiser also noted that "[Mr. Kestner had] no obvious abnormalities except for low

19  valproate level, but [he] only recently started on the valproate and discussed the seizure episode

20  today with his neurologist, who recommends he increase his dose to 500mg twice daily from his

21  current 250mg twice daily, with which I agree."  AR 603-04.  Dr. Romeiser's final diagnosis was

22  that Mr. Kestner had "[s]eizure disorder with breakthrough seizure and subtherapeutic valproate

23  level."  AR 604.

24  ### 13.  *Dr. John Fahlberg, State Agency Medical Consultant*

25  On February 16, 2011, State agency medical consultant John Fahlberg reviewed the medical

26  evidence in Mr. Kestner's file.  *See* AR 645; *see also* ALJ Decision, AR 27 (indicating AR 645 was

27  written by an agency medical consultant).  Dr. Fahlberg's one paragraph review focuses largely on

28  Mr. Kestner's compliance with medical recommendations.  He concluded, that Mr. Kestner "clearly

UNITED STATES DISTRICT COURT
For the Northern District of California

is not fully agreeable or compliant with treatment and is not[] optimally controlled at this stage. Agree with in initial limitations and there is a very good chance of better control if [Mr. Kestner] would comply."  AR 645.

### 14. *UCSF Epilepsy Center and Dr. Tina Shih from February 2011 to February 2012*

From February 22 to 28, 2011, Mr. Kestner underwent a six-day EEG study during which the UCSF Epilepsy Center deprived him of sleep and anticonvulsant medication in an attempt to induce and observe his seizures.  *See* AR 677-79.  The discharge summary was dictated by Dr. Manu Hegde.  *See* AR 679.  Although Mr. Kestner did not have a seizure during this study, "throughout the recording he had bifrontally predominant generalized epileptiform discharges that often had a polyspike and wave appearance.  They became more frequent as the recording progressed and medications were weaned off.  No clinical change was noted with the vast majority of discharges." AR 677.

Although the EEG study was not "a completely diagnostic study," Dr. Hegde "strongly suspect[ed] that the patient has juvenile myoclonic epilepsy based on his history, interictal findings and myoclonic jerks."  *Id.*  Dr. Hegde noted that Mr. Kestner had a "very limited understanding of this diagnosis."  He was also "very apprehensive about his inability to work.  He lost a job in construction due to recurrent seizures and was rejected on his initial claim for disability."  AR 677-78.  Regarding disability, Dr. Hegde, "informed him that if his seizures remain refractory, we would be happy to support further applications for disability and that our patients are often rejected on the first attempt."  AR 678.  As a result of the study, Dr. Hegde increased Mr. Kestner's dosage of divalproex sodium to 2500 mg daily.  AR 678.

On March 21, 2011, Dr. Shih wrote "a comprehensive evaluation of [Mr. Kestner's] physical health and estimations of his functional ability based on my examination and comprehensive review of his medical record."  AR 675.  She opined that "[Mr. Kestner] continues to experience convulsive seizures approximately once every other month and nonconvulsive seizures (confusion, inattention) twice per week" and that "[h]e has never had an extended period of seizure freedom."  *Id.*  Her "[c]linical [i]mpression" was that Mr. Kestner had "[e]pilepsy with disabling seizures."  *Id.*  She concluded with the following:

**Based on the above evaluation, I believe that Mr. Kestner is limited by his condition in the following manner:**

• His disabling seizures continue to occur and are affecting his activities of daily living.

• The patient's condition is likely to produce good and bad days, but on the whole he is likely to be absent from work more than six days per month based on his current frequency of seizures."

AR 675 (emphasis in original).

On April 25, 2011, Dr. Shih wrote a letter regarding Mr. Kestner's application for benefits. *See* AR 674. She stated that "Kevin Kestner is being followed at the UCSF Epilepsy Center for the treatment of ongoing seizures that are difficult to control. Mr. Kestner would benefit from obtaining disability benefits until his seizures are better controlled." *Id.*

On September 21, 2011, Mr. Kestner, accompanied by his father, attended a follow-up appointment with Dr. Shih. AR 672-73. Mr. Kestner reported that he had been "seizure-free for over three months." AR 672. At the time, his last reported seizure was on June 12, 2011. *Id.* Mr. Kestner's father showed Dr. Shih "a video of what appears to be [Mr. Kestner's] postictal state from the June 2011 seizure. [Mr. Kestner] appeared to be breathing loudly with significant amount of saliva in his mouth (characteristic postconvulsive sounds)." *Id.* As of the September 2011 appointment, Mr. Kestner was taking "Divalproex ER 500mg 3 tablets twice a day" and "Diazepam 10 mg 1 tablet tid." AR 672.

Mr. Kestner reported that he had been living with his father for six months and wanted to apply for a driver's license. *Id.* He recently had been hired by Safeway "to work in the meat department (24 hours/week)." *Id.* Finally, he reported that he had not had any alcohol since May 2011 and that he had lost 40 pounds through regular exercise. *Id.* Dr. Shih concluded Mr. Kestner was "seizure-free on a stable dose of medication" and that he was adhering to his medication regimen. AR 672-73. Dr. Shih also noted that she "filled out his DMV paperwork" and "refilled his medications." AR 673.

Dr. Shih filled out a "Seizures Residual Functional Capacity Questionnaire" regarding Mr. Kestner, which she signed and dated on February 27, 2012. *See* AR 753-56. Dr. Shih noted that Mr. Kestner's last three reported seizures were in January 2012, June 2011, and April 2011. AR 753.

She also indicated that he was "currently compliant with taking medication" and had been compliant for "probably 14 months at least (December 2010 - current)." *Id.* She noted that Mr. Kestner's compliance was an issue in 2010 and that Mr. Kestner was "[intolerant] of Oxcarbazepine, Topiramate, and Levetiracetam because of side-effects, mood problems + nausea + rash/hives." *Id.*

She indicated that Mr. Kestner's alcohol use probably contributed to his seizures between February and April 2010, "but he was also not on therapeutic doses of anticonvulsants" during that time. AR 754. Furthermore, she indicated that she was not aware of any alcohol use since May 2010. *Id.*

Dr. Shih cited stress and sleep deprivation as precipitating factors causing Mr. Kestner's seizures. *Id.* In addition, she commented that he could take the bus alone but could not operate a motor vehicle. *Id.* She also noted that if a seizure occurred, it likely would disrupt the work of his coworkers but it would not endanger them. *Id.* Mr. Kestner would not need more supervision at work than an unimpaired worker, though he could not work at heights or operate power machines that require an alert operator. *Id.*

Dr. Shih further remarked that Mr. Kestner's post-seizure manifestations included confusion, exhaustion, irritability, severe headaches, and muscle strain. AR 755. The questionnaire asked Dr. Shih to "estimate the time period after a seizure that postictal manifestations prevent return to work and reduce work attention or pace," to which Dr. Shih responded "1-2 days." *See* AR 755. She also indicated that Mr. Kestner has the "associated mental problems" of depression, social isolation, and behavior extremes. *Id.*

"[A]s a result of [Mr. Kestner's] seizures, post-ictal manifestations, medication side effects, and associated mental impairments," he had the following functional limitations: no "[r]estriction of activities of daily living; mild "[d]ifficulties in maintaining social functioning;" mild "deficiencies of concentration, persistence or pace;" and one or two "[r]epeated episodes of decompensation within 12 month period, each of at least two weeks duration." *Id.*

She also indicated that Mr. Kestner was "capable of low stress jobs" but not moderate or high stress work. *See* AR 755. Finally, Dr. Shih estimated that as a result of his impairment or treatment, Mr. Kestner was likely to miss an average of one day of work every two to three months. AR 756.

**B. Vocational Expert's Testimony**

Vocational Expert Alan Nelson ("VE") testified at the March 15, 2012 hearing on Mr. Kestner's benefits applications. *See* AR 38.  The ALJ first asked the VE to identify Mr. Kestner's past work performed in the last 15 years. AR 66.  The VE responded that Mr. Kestner had worked as a security guard, construction laborer, and a home attendant.  *Id.*

The ALJ then asked whether an individual with the following characteristics could hold those positions:

> [A]ble to perform work at all exertional levels with the following additional limitations. Frequently climbing ramps or stairs.  Never climbing ladders, ropes or scaffolds.  Frequently balancing, stooping, kneeling, crouching and crawling, but avoiding all exposure to workplace hazards such as unprotected machinery, unprotected heights, commercial driving, working around sharp objects, using power tools, work around open water or open pits due to the seizure activities. . .
>
> With work limited to simple, routine and repetitive tasks involving only simple work-related decisions with few, if any, workplace changes and no interaction with the public, I assume that's going to preclude the past work?

AR 66-67.  The VE responded that it would.  AR 67.

The ALJ then asked whether there were other jobs in the regional or national economy that a person of Mr. Kestner's age, education, work experience, and RFC could perform any other jobs in the regional or national economy.  *Id.*  The VE responded that such an individual could work as an assembler or table worker.  *Id.*  The VE stated that there were 239,550 assembler positions nationally and 1,920 locally.  *Id.*  The VE also stated that there were 430,450 table worker positions nationally and 4,160 locally.  *Id.*  "Locally" meant the San Francisco, Oakland, and Fremont metropolitan statistical areas.  *Id.*

The ALJ then asked the VE what the allowed rate of absenteeism would be for a person to maintain employment.  *Id.*  The VE responded that "[if] you have two or more unscheduled absences, random absences per month, then it's a red flag for employers to be concerned about your attendance."  *Id.*

Claimant's attorney Barbara Mann then asked the VE questions regarding stressful work environments, social impairment, and absenteeism.  AR 68-69.  First, Ms. Mann asked whether a requirement of a "low-stress work environment" would preclude the assembler and table worker

positions.  AR 68.  The ALJ interjected, saying that Ms. Mann would have to "define low-stress more particularly" because "[d]ifferent people are stressed by different things."  *Id.*  Ms. Mann defined "low-stress" as "having a requirement to perform work skills at a specified pace and to have requisite number of . . . items completed over the course of a day."  *Id.*  The VE responded that if Mr. Kestner were "unable to contend with . . . production demands and actually maintaining a certain pace and persistence, if that was a, a moderate problem and not a minor problem, then . . . it would [preclude] those positions."  AR 68.  Ms. Mann also asked whether it would "pose a difficulty" if Mr. Kestner "were not able to function at . . . a high competitive work pace."  *Id.*  According to the transcript, the VE's response was inaudible.  *Id.*

Second, Ms. Mann asked the VE to assume that Mr. Kestner's "ability to interact with supervisors and coworker is moderately[12] impaired," meaning he would be unable to interact with supervisors or coworkers for at least one-third of the workday.  AR 68-69.  The VE testified that Mr. Kestner "would be unemployable if that was the case."  *Id.*

Third, Ms. Mann posed the following hypothetical to the VE:

> ATTY:  Assume that the Claimant had one seizure . . . [that] interrupted his work tasks suddenly and without warning once every other month and would not be able to attend work the following day.  Would that limit his ability to perform the assembly worker, table worker positions?
>
> VE:  Yes.  I don't think those positions would be feasible . . . I don't think those . . . behaviors would be accepted by employers.  I think he would have difficulty maintaining employment if that was happening as consistently as that.

AR 69.

**C. Witness Testimony**

   ***1. Mr. Kevin Kestner, Claimant***

During the March 15, 2012 hearing, Mr. Kestner described his personal background, employment history, and medical impairment.  *See* AR 40-59.

Mr. Kestner testified that he was born on December 30, 1985, was five feet ten inches tall, and

----

[12]  Ms. Mann referenced the August 26, 2010 assessment of psychological assistant, Jacklyn Chandler, Ph.D., as the basis for this assumption.  *See* AR 68 (citing AR 424).

UNITED STATES DISTRICT COURT
For the Northern District of California

weighed 245 pounds. AR 40-41. On and off over the past twenty-six years, he had lived in a house with his father and grandfather. AR 40. He was married from 2008 to 2011. AR 54. He was divorced, and he and his ex-wife shared equal custody over their three-year-old son. AR 40-41. Mr. Kestner's highest level of education was a GED, which he attained in the eleventh grade. *Id.* Since January 2012, he was attending Loma Vista adult education classes to become an administrative assistant. AR 41-42. Mr. Kestner had not had any other vocational training and he had not served in the military. AR 42. As of the hearing date, he had not received any private income or public assistance. AR 42. He did not have medical insurance. *Id.* He also had not received any workman's compensation for his impairments. *Id.* Furthermore, Mr. Kestner did not have a driver's license; he lost his driving privileges in 2010 or 2011 when his doctor wrote to the DMV concerning his epilepsy. AR 51-52.

Mr. Kestner last worked on January 7, 2012. AR 42. Although he served as a meat packer for four months in a Safeway retail store, he was laid off when his adult education classes began conflicting with his work schedule. AR 42-43. In this position, Mr. Kestner earned about nine dollars per hour. AR 44. In 2010, he earned $1,500 from self-employment but does not remember the nature of the work involved. *Id.* In 2007 or 2008, he served as an unarmed security guard for Forbes Security and the Mercy Housing Management Group. AR 44-45. In 2007, he provided paid home care for a close family friend through IHSS.[13] AR 45-46. In 2004 and 2005, when he was eighteen and nineteen respectively, Mr. Kestner earned less than $1,000 per year. AR 46.

The ALJ then asked him about his impairments and disabilities. *Id.* Mr. Kestner said that he experienced his first seizure when he was sixteen years old. *Id.* As of the hearing date, he had been taking Divalproex for his seizures but did not know for how long. AR 47-48. Before Divalproex, he had tried taking other medications and the "last one" gave him "terrible hives." AR 48. After he started taking Divalproex, he still suffered four or five seizures. *Id.* While on his new medication,

---

[13] IHSS (In-Home Support Services) is a state-funded program administered by counties that provides assistance to aged, blind, and disabled individuals so they can safely remain in their homes. *In-Home Support Services (IHSS) Program*, California Department of Social Services, http://www.cdss.ca.gov/agedblinddisabled/pg1296.htm (last visited July 15, 2014).

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  he can sometimes feel his seizures coming on and may make involuntary movements, such as

2  dropping a pen from his hand.  AR 48-49.  He confirmed that he loses consciousness during his

3  seizures.  *Id.*  Mr. Kestner reported that he sees Dr. Tina Shih for his seizures and has been her

4  patient since 2010 or 2011.  AR 49.  To control his seizures, he has adjusted his diet, sleep habits,

5  and exercise habits.  *Id.*  Until a few months prior to the hearing, he took Diazepam for his anxiety,

6  but then stopped at Dr. Shih's suggestion.  AR 49-50.

7      The ALJ remarked that in 2010, a physician at John Muir Hospital noted that Mr. Kestner's use

8  of alcohol had lowered his threshold for seizures, and the ALJ asked whether he was still drinking.

9  AR 50.  Mr. Kestner said he had spoke to his doctors about the effects of alcohol and no longer

10  drinks.  *Id.*  He further stated that he has never been arrested for a DUI or any other alcohol-related

11  offense.  *Id.*  Mr. Kestner testified that he used marijuana when he is "stressed out," but he does not

12  smoke it that often.  AR 50-51.  He confirmed that Dr. Shih was aware of his marijuana use and that

13  she told him to get a prescription if it helps with his anxiety.  AR 51.

14      While working at Safeway, Mr. Kestner did not experience any seizures on the job.  *Id.*  While

15  employed by Safeway, he had a seizure and had to stay in bed the whole next day.  *Id.*  He did not

16  know whether he had work that day, though.  *Id.*  Mr. Kestner stated that it takes about twenty-four

17  to forty-eight hours to fully recover after a seizure.  *Id.*

18      The ALJ remarked that while Mr. Kestner claimed he had nine to ten seizures over a twenty-five

19  day period prior to his August 26, 2010 appointment with Dr. Chandler, the medical records did not

20  indicate corresponding visits to his doctor.  AR 52.  Mr. Kestner said that he did not always go to the

21  doctor when he experienced a seizure and that he also had fifteen seizures in September 2010 alone.

22  *Id.*  The ALJ also remarked that his neurologist's records indicate that he was not filling his

23  prescription and asked if that was due to the side effects.  *Id.*  While Mr. Kestner did not know the

24  details concerning the prescription, he said that there was a time when he lost medical coverage.  AR

25  52-53.  When he regained his coverage, Mr. Kestner started to see his doctor again and tried some

26  other medications before settling on the current one.  *Id.*

27      The ALJ then asked Mr. Kestner to describe his typical day-to-day activities.  AR 53.  Mr.

28  Kestner said that he straightens up his house, stays at home most of the time, occasionally goes to

school, and spends time with his son when he has custody. *Id.* Mr. Kestner's father, Mike Kestner, also helps take of Mr. Kestner's son. *Id.*

Finally, the ALJ asked Mr. Kestner if his seizures ever interfered with his ability to interact with other people, such as friends and family. *Id.* Mr. Kestner explained that when he was younger, friends often visited his house, but after his seizures began, "people started disappearing" because "they didn't want to be around that or see that." AR 54.

Ms. Mann then asked Mr. Kestner questions regarding the nature of his seizures, difficulties with memory, and social anxiety. AR 54-59. First, she asked him to describe the two types of seizures he experiences. AR 54. Mr. Kestner explained that one kind of seizure, which he described as "not-as-bad," caused him to "jerk or lose train of thought, drop things," fall, and become very forgetful. *Id.* The other type of seizure causes him to "jerk," his "body tenses up," and bite his tongue. AR 55. Mr. Kestner then described a seizure at John Muir Hospital:

> I took my son there because he had a bad fever. I'd been up all night with him. I didn't get my recommended amount of sleep, so when we laid down in the hospital bed, I was trying to calm my son, I had a seizure. The nurse saw it, and it was pretty bad. They said I was jerking around. It took seven people to control my jerks from – so I wouldn't hurt myself. When I woke up, you know, they told me what had happened.

*Id.* He noted that the last time he had "the lower-level seizures" "[a] couple days before I had my last breakthrough seizure," which was in December 2011 or January 2012. AR 55. During the breakthrough seizure, he lost consciousness in the shower and woke up in the bathtub with his father "sitting there crying, trying to get me to wake up." AR 61. He was hurt for almost two weeks afterwards and could not turn his neck or shoulders. *Id.*

Describing his seizure activity from 2009 to the date of the hearing, Mr. Kestner stated that "[f]or a couple of years there it was really bad. It was really, really bad. Couldn't, couldn't get any work. Can't drive. I can't even ride a bicycle. It's recommended that I don't even use (INAUDIBLE) or bus by myself, so it was hard to get around. It was hard to deal with all the new pressures in my life, I guess you could say." AR 55.

Second, Ms. Mann asked Mr. Kestner whether he has any issues with memory. *Id.* Mr. Kestner said that at first, his memory was "really, really spotty" and he would, for instance, "forget to grab the gallon of milk or whatever." AR 56. At the time of the hearing he could not remember his son's

1    birth, first two birthdays, or driving directions.  *Id.*  Providing an example, he said that he has

2    forgotten how to drive to his aunt's house, where he has been going his entire life.  *Id.*  Mr. Kestner

3    also confirmed that he had forgotten when he was supposed to go in to work at Safeway.  AR 56-57.

4    He also cannot remember phone numbers like he used to and on the day of the hearing quickly

5    forgot that the security guard had given him directions to the hearing room.  *Id.*

6        Third, Ms. Mann asked Mr. Kestner to describe any issues he has with anxiety, apart from his

7    seizure disorder.  AR 57.  He testified that he gets nervous around large groups of people or "when

8    someone gets loud or obnoxious."  *Id.*  Mr. Kestner also said that when "someone . . . puts [him] in a

9    tense situation . . . [he starts] to get nervous and shut down," he does not want to speak, and his

10   stomach hurts.  *Id.*  Mr. Kestner also confirmed that he tends to self-isolate and that his anxiety-

11   related problems have gotten worse during the year leading up to the hearing.  AR 57-58.  Regarding

12   his position at Safeway, Mr. Kestner said that he had difficulty remembering tasks and relied on a

13   coworker to write them down for him.  AR 58.  Lastly, Mr. Kestner said that he is generally

14   suspicious of others and tries to avoid the public where possible.  AR 58-59.

15        ### 2. *Mr. Mike Kestner, Claimant's Father*

16       Mr. Kestner's father, Mike Kestner, testified to his son's problems with seizures, memory loss,

17   and anxiety.  AR 59-66.  Mike is a maintenance supervisor who works forty hours per week and is

18   typically away from home between five in the morning and five in the evening.  AR 59, 65.

19       First, describing Kevin's seizures as "nasty," Mike said that "[Kevin] screams, and then by the

20   time I get to him, he's biting his tongue, clenched tight . . . and screaming, trying to scream, but he's

21   biting down on his tongue."  AR 60.  As to the frequency and intensity of his son's seizures, Mike

22   stated that "[t]he very beginning of 2011 was pretty rough.  The end of 2010 was real bad.  But after,

23   after he got with Dr. Shih, they, they got on some decent medication for him, and they started

24   backing way down, you know."  AR 60.

25       Second, regarding Kevin's memory problems, Mike said that his son now forgets times, dates,

26   directions, and simple tasks.  AR 61-63.  Those tasks include laundry, cooking, and taking care of

27   the family dog.  AR 61-62.  He went on to say that Kevin sometimes forgets that their freestanding

28   wood stove is hot and then burns his hands by touching the stove's metal handles.  AR 61.

1   Providing another example, Mike said that Kevin forgot the directions to his grandfather's house

2   that Kevin had visited several hundred times.  AR 62-63.  Mike also said that due to his son's

3   forgetfulness and inability to drive, Kevin has to either take the bus or wait for Mike to come home

4   to run errands.  AR 63.

5   Third, with respect to Kevin's anxiety, Mike described his son as a "worrywart from day one,"

6   and said that Kevin worried excessively about household bills, taxes, and insurance.  AR 63-64.

7   Mike then noted that Kevin "gets real irritable sometimes," possibly due to "the fact that he doesn't

8   get out much."  AR 64.  He also remarked that it had been a "long time" since he last observed

9   Kevin drink alcohol.  *Id.*

10   Finally, the ALJ asked Mike Kestner whether he felt comfortable leaving his grandson at home

11   with Kevin during the day.  AR 65.  Mike said he did not worry because Kevin's grandfather, who is

12   91, also lives with them at their house.  *Id.*  At this point in the hearing, Kevin interjected, saying

13   that the Kestner family has a roommate that is at home "90 percent of the time when [Kevin's] son is

14   there."  *Id.*

15   **D.  Summary of the ALJ's Decision**

16   On April 3, 2012**,** the ALJ issued a decision holding that Mr. Kestner was not disabled under

17   sections 216(i), 223(d), or 1614(a)(3)(A) of the Social Security Act and was therefore not entitled to

18   disability or social security benefits.  *See* ALJ Decision, AR 19-31 at 31.

19   *1.  Mr. Kestner Had Not Engaged in Substantial Gainful Activity*

20   At step one of the sequential evaluative process (described below), the ALJ determined that Mr.

21   Kestner met the insured status requirements of the Social Security Act through March 31, 2011, and

22   had not engaged in substantial gainful activity since January 1, 2009.  AR 21.

23   *2.  Mr. Kestner's Impairments Did Not Meet or Medically Equal Any Listed Impairment*

24   At step two, the ALJ found that Mr. Kestner suffered from the following severe impairments:

25   seizure disorder, obesity, and anxiety disorder.  *Id.*  At step three, the ALJ determined that "they

26   [did] not, when considered singly or in combination, meet the criteria of any listed impairments

27   described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1)."  AR 21-22.  The

28   ALJ went on to say that "[n]o treating or examining physician has mentioned findings equivalent in

severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment."  AR 22.

First, the ALJ found that while Mr. Kestner's obesity was a medically determinable impairment, he noted that obesity alone cannot serve as the basis for disability.  *Id.*  The ALJ said that he still took Mr. Kestner's obesity impairment into account when determining his RFC.  *Id.*

Second, the ALJ found that the severity of Mr. Kestner's combined impairments did not meet or medically equal the any listing, and specifically listing 12.06.  *Id.*  In concluding that Mr. Kestner's impairments neither met nor were medically equal to the listings, the ALJ held that the "paragraph B" criteria were not satisfied because Mr. Kestner did not have "at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration."  *Id.*  The ALJ noted that "a marked limitation means more than moderate but less than extreme.  Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  *Id.*

In considering the Paragraph B criteria, the ALJ found that Mr. Kestner has a mild restriction on daily living activities.  AR 22.  He remarked that Mr. Kestner was able to work on a part-time basis, take care of his young child, attend school, perform household chores, go shopping twice per month, count change, handle a checkbook and savings account, and dress and groom himself, but could not take a bus or drive a car alone.  AR 22-23.

The ALJ also found that Mr. Kestner had mild difficulties with social functioning.  *Id.*  The ALJ acknowledged Mr. Kestner's statement that he had "trouble interacting with large groups of people becoming nervous or suspicious of strangers, but found that "[Mr. Kestner] was able to spend time with his family, talk on the telephone daily, go to school, and attend regular medical appointments."  *Id.*  Furthermore, while Mr. Kestner appeared "nervous, worried, and anxious" at his consultative examination, he was able to "interact politely and genuinely with only mild difficulty interacting appropriately with the examiner."  *Id.*

The ALJ found that Mr. Kestner had moderate difficulties with concentration, persistence, and

1   pace.  *Id.*  The ALJ noted Mr. Kestner's memory difficulties as well as his ability to participate in

2   several activities requiring functionality in this area:

3       [Mr. Kestner] remains able to attend classes for adult education, worked at least part-time as a
    meat packer into 2012, and is responsible for the part-time care of his 3-year-old son.  The

4       claimant also reported he watches television and reads as hobbies.  During a consultative
    examination, the claimant had difficulty enduring stress, but displayed linear thought

5       processing, logical thought content, clear and coherent speech, grossly intact memory, and
    achieved a test score of 28/30 on the Folstein Mini Mental State Examination, which was in

6       the normal range.  These findings are consistent with at most moderate difficulties in this
    functional area.

7

8   *Id.* (internal citations omitted).

9       The ALJ found that Mr. Kestner did not meet the duration criteria for listing 12.06 because he

10   did not have mental episodes of decompensation of the requisite duration, except for seizures, which

11   were did not endure for the length required by listing 12.06.  *Id.*  Having determined that Mr.

12   Kestner did not suffer from either two marked limitations or one marked limitation with repeated

13   episodes of decompensation, the ALJ concluded that his mental impairment did not meet

14   "paragraph B" regulatory criteria for anxiety.  *Id.*

15       Furthermore, the ALJ found that the evidence failed to establish the presence of "paragraph C"

16   criteria:

17       [Mr. Kestner suffered] no repeated episodes of decompensation, each of extended duration.
    [He] has no residual disease process resulting in such marginal adjustment that an increase in

18       mental demands or change in environment would be predicted to cause the claimant to
    decompensate.  Nor is there a current history of one or more years of an inability to function

19       outside a highly supportive living arrangement with an indication of continued need for such
    an arrangement.

20

21   *Id.*

22       **3.  Mr. Kestner's RFC Included Work with Non-Exertional Limitations**

23       The ALJ found that "Mr. Kestner has the [RFC] to perform a full range of work at all exertional

24   levels but with additional non-exertional limitations."  AR 24.  The ALJ determined Mr. Kestner had

25   the following RFC:

26       [T]he claimant may frequently climb ramps/stairs, but never climb ladders/ropes/scaffolds.
    He may frequently balance, stoop, kneel, crouch, and crawl but must avoid all exposure to

27       workplace hazards (such as unprotected heights, dangerous machinery, commercial driving,
    working around sharp objects, working using power tools, and working around open water or

28       open pits).  The claimant is limited to simple, routine, and repetitive tasks, involving simple,

UNITED STATES DISTRICT COURT
For the Northern District of California

work related decisions, with few, if any, work place changes.  He may not have any interaction with the public.

*Id.*  In making this RFC finding, the ALJ said he considered Mr. Kestner's symptoms and how consistent they were with the objective medical evidence, and that he would consider opinion evidence in accordance with prevailing regulatory requirements.  *Id.*

Next, the ALJ explained the analytical framework he would adopt to reach his RFC findings.  *Id.* The ALJ said that he must follow a two-step process to consider Mr. Kestner's symptoms.  *Id.*  First, he said he was required to determine whether there was a medically determinable physical or mental impairment that reasonably could be expected to produce Mr. Kestner's pain and symptoms.  *Id.* Second, once he identified such an impairment, the ALJ said that he must evaluate the intensity, persistence, and limiting effects of Mr. Kestner's functioning.  *Id.*  Where objective medical evidence did not support statements concerning Mr. Kestner's symptoms, the ALJ said that he was obligated to judge the credibility of those statements by considering the record as a whole.  *Id.*

### i. Mr. Kestner's Testimony

Mr. Kestner alleged disability based on epilepsy and anxiety disorder.  *Id.*  Mr. Kestner reported that "his impairments cause him to experience seizures, body jerking/convulsions, tongue biting, loss of consciousness, loss of grasp of objects, nervousness around large groups of people or loud noises, poor memory, lack of energy, desire to self-isolate, and feelings of suspiciousness in others." *Id.* He also reported losing his driver's license because of his seizures and numerous additional functional limitations.  *Id.*

The ALJ then remarked that despite his alleged difficulties and limitations, Mr. Kestner admitted that he could work on a part-time basis, attend school, and take care of his three-year-old son.  AR 25.  He could perform household chores, watch television, read, lift weights, spend time with his family, talk on the phone, and attend regular medical appointments.  *Id.*

Although Mr. Kestner's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the ALJ held that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment."  *Id.*  The ALJ found that Mr. Kestner's complaints were: "1) inconsistent with

UNITED STATES DISTRICT COURT
For the Northern District of California

1    treatment received; 2) out of proportion to the objective clinical findings; 3) internally inconsistent;

2    and 4) inconsistent with daily activities." *Id.*

3        ### ii. Family Testimony

4        Turning to the family testimony, the ALJ gave little weight to the statements of Mr. Kestner's

5    ex-wife and father.  AR 25-26.  First, the ALJ discounted the third-0party function report written by

6    Adrianna Kestner.  AR 25.  For potential insight into the severity of Mr. Kestner's impairments, the

7    ALJ considered Adrianna's statements regarding Mr. Kestner's daily activities and functional

8    limitations.  *Id.*  The ALJ nevertheless gave her statements "little weight with respect to assessing

9    the claimant's current functional limitations" citing their "inherent bias/subjectivity, lack of

10   medically acceptable standards, lack of first-hand observation, and their general inconsistency with

11   the objective medical evidence."  *Id.*

12       Second, the ALJ discounted the oral testimony of Mike Kestner, Mr. Kestner's father.  AR 25-

13   26.  As with Adrianna Kestner's statements, the ALJ considered Mike Kestner's testimony regarding

14   Mr. Kestner's seizures and memory loss for insight into their severity.[14]  *See* AR 25.  The ALJ noted,

15   however, that Mike Kestner did not express concern about leaving Mr. Kestner alone at home with

16   his three-year-old son and ninety-one-year-old grandfather.  *See id.*  The ALJ rejected Mike

17   Kestner's testimony, again citing "inherent bias/subjectivity, lack of medically acceptable standards,

18   lack of first-hand observation, and general inconsistency with the objective medical evidence."

19   AR 26.  "It does not make logically follow [*sic*] that the claimant's father has no worry about

20   leaving his son in charge of his 91-year-old grandfather or 3-year old son, if the claimant could

21   hardly remember not to touch the stove when it was hot."  AR 26.

22       ### iii. Objective Medical Evidence

23       The ALJ found that the objective medical evidence here "fails to provide strong support for [Mr.

24   _____

25       [14]  The ALJ remarked that based on Mike Kestner's testimony, his son's "seizures [were]
     nasty, he screams, he bites his tongue, and he clenches his body, but within the last year, his seizures
26   improved significantly."  *Id.* (citation omitted).  Mike Kestner also testified that Mr. Kestner had
     "difficulty with memory, specifically, forgetting times, dates, directions, simple tasks/requests, and
27   not to touch the stove when hot."  *Id.* (citation omitted).  Mike Kestner also reported that Mr.
28   Kestner "worries about unusual things like paying property taxes and bills."  *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Kestner's] allegations of disabling symptoms and limitations.  Instead, it provides strong support for

2   the [RFC] to continue to work at all exertional levels with environmental restrictions and some

3   mental limitations." *Id.*  First, the ALJ determined that there was no basis for a finding of disability

4   prior to May 1, 2009, as Mr. Kestner did not provide medical records dated any earlier. *Id.*  Second,

5   the ALJ found that based on his body-mass index, Mr. Kestner was obese and that his doctor put him

6   on a diet to control his weight and hypertension. *Id.*  Third, the ALJ remarked that although his

7   symptoms of anxiety improved by using Diazepam, no clinical findings supported Mr. Kestner's

8   alleged anxiety disorder. *Id.*

9       Lastly, discussing Mr. Kestner's seizures, the ALJ said that they were first noted in February

10  2010 at John Muir Medical Center, though Mr. Kestner's wife had reported seeing him convulse in

11  his sleep before that. *Id.*  The ALJ considered one episode, citing a CT scan of Mr. Kestner's brain,

12  for which the treating physician did not note any abnormal findings as well as Mr. Kestner reported

13  unawareness of his alleged seizure but ability to recall experiencing a lapse of time and biting his

14  tongue. *Id.*  The ALJ remarked that while a "physical examination confirmed a contusion to the left

15  lateral aspect of the tongue," the exam revealed no other abnormalities. *Id.*  Citing the treating

16  physician's opinion, the ALJ noted that "Mr. Kestner's use of alcohol (reported to be a 6-pack of

17  beer a day) likely lowered his seizure threshold but that [he] was stable upon discharge." *Id.*

18      The ALJ went on to say that Mr. Kestner's only confirmed seizure occurred during an August

19  2010 MRI. *Id.*  Referring to Dr. Tangco's treatment notes, the ALJ remarked that Mr. Kestner had

20  stopped taking the anti-seizure medication Depakote a few days prior to the reported seizure due to

21  his "libido plummeting." *Id.*  Dr. Tangco's notes reveal her "repeated attempts to follow up with

22  [Mr. Kestner] with no response to several messages and no return to treatment for the remainder of

23  August 2010." *Id.*  The ALJ opined that Mr. Kestner's non-responsiveness indicated "his condition

24  was not as severe as alleged."  AR 27.  While conceding Mr. Kestner later returned to her care in

25  September 2010, the ALJ noted her diagnosis of "probable" primary generalized/juvenile myoclonic

26  epilepsy indicated Dr. Tangco's lack of certainty. *Id.*

27      Turning to Mr. Kestner's reported seizure in November 2010 at John Muir Medical Center in

28  Concord, the ALJ remarked that "no medical professionals reported seeing this seizure nor did they

1   find any signs of distress or seizure activity when physically examining the claimant." *Id.*  The ALJ

2   noted that "the emergency room doctor indicated that [Mr. Kestner's] laboratory findings did show a

3   low valproate level suggesting medical noncompliance with prescribed medication." *Id.*  Taken

4   together with the August 2010 seizure episode, the ALJ opined that Mr. Kestner's seizures appear

5   controlled when he was compliant with medication. *Id.*

6   The ALJ then discussed the August 2010 limitations placed by the State agency medical

7   consultant. *Id.*  Based primarily on his seizure disorder, the medical consultant restricted Mr.

8   Kestner from moderate hazards, such as heights and machinery, as well as climbing ladders, ropes,

9   and scaffolds. *Id.*  The ALJ gave great weight to these restrictions, explaining that they were

10  "consistent with the record as a whole." *Id.*  The ALJ then added to the RFC specific workplace

11  hazards that Mr. Kestner should avoid. *Id.*

12  The ALJ remarked that "[t]hese limitations are all consistent with those set forth by Tina Shih,

13  M.D., at the Neurology Epilepsy Center UCSF [on] February 27, 2012" and then summarized those

14  restrictions as the following:

15  > [Mr. Kestner] would likely miss work approximately one day every two to three months,
    > could perform low stress jobs, would not be able to work with power machines or at heights,
16  > would not need more supervision than an unimpaired worker, would not be dangerous to
    > others would likely disrupt their work if seizures occurred, and could not operate a motor
17  > vehicle.

18  *Id.*

19  Dr. Shih also "opined [Mr. Kestner] could take the bus alone, had no restrictions of daily living

20  activities, and no more than mild difficulties in maintaining social functioning, or with

21  concentration, persistence or pace." *Id.*  The ALJ concluded that Dr. Shih's opinion here should be

22  given "significant weight" as it was "supported by the record as a whole." *Id.*

23  On the other hand, the ALJ gave little weight to Dr. Shih's earlier opinions in December 2010

24  and March 2011. *Id.*  Specifically, Dr. Shih believed "[Mr. Kestner's] seizures . . . affected his

25  activities of daily living, and created a likelihood of absence from work more than six days a month

26  based on the frequency of his seizures." *Id.*  The ALJ found these opinions unpersuasive as they

27  were inconsistent with Dr. Shih's overall medical findings. *Id.*

28  The ALJ pointed out three purported inconsistencies. *Id.*  First, despite undergoing "sleep

1    deprivation, hyperventilation, and photic stimulation," Mr. Kestner's six-day EEG monitoring

2    session did not capture any convulsive seizures.  *Id.*  Second, the ALJ remarked that according to Dr.

3    Shih's notes, Mr. Kestner was "seizure-free for over three months with no periods of

4    unresponsiveness, unexplained injuries, loss of urine, or loss of time" while on medication.  *Id.*

5    Third, the ALJ observed that in September 2011, "Dr. Shih completed paperwork to allow [Mr.

6    Kestner] to obtain a driver's license" and that her opinion on his capacity to drive "indicate[s]

7    greater capability than her March 2011 opinion would suggest."  AR 27-28.

8         Furthermore, the ALJ commented that Dr. Shih "relied heavily" on Mr. Kestner's "subjective

9    report of symptoms and limitations" and "seemed to uncritically accept as true, most, if not all of

10   what [Mr. Kestner] reported."  AR 28.  The ALJ also noted how "[Dr. Shih] provided no information

11   about which activities of daily living were allegedly affected or to what extent" and that "she ha[d]

12   no firsthand knowledge of any seizure actually experienced by [Mr. Kestner]."  *Id.*  Finally, the ALJ

13   remarked that "[t]he EEG findings [were] 'highly associated with epilepsy' but [were] not

14   conclusive."  *Id.* (quoting AR 641).

15        In contrast, the ALJ accorded great weight to Dr. Angelita Tangco's April 2010 opinion.  *See id.*

16   Dr. Tangco indicated that "[Mr. Kestner] should refrain from operating a motor vehicle, bicycle, or

17   other moving vehicle that could cause injury to himself or others."  *Id.*  According to the ALJ, Dr.

18   Tangco further opined that "[Mr. Kestner] should avoid activities putting him or others at risk if he

19   were to have a seizure, including working at heights, working with sharp objects, working with

20   power machines, and working in pools."  AR 28.  The ALJ found Dr. Tangco's opinion persuasive

21   as "these type[s] of restrictions are appropriate based on the claimant's alleged seizure disorder."  *Id.*

22        Turning to alleged mental impairments, the ALJ concluded that Mr. Kestner was able to

23   "perform at least simple, routine, and repetitive tasks, involving simple, work related decisions, with

24   few, if any, work place changes and that he should not have any interaction with the public."  *Id.*

25   The ALJ stated that these limitations were supported by "the record as a whole, including

26   assessments from psychological consultants."  *Id.*  According to a reviewing State agency

27   psychological consultant in October 2010, Mr. Kestner had "no more than a mild limitation in any of

28   the functional areas including activities of daily living, social functioning, and concentration,

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

persistence, or pace." *Id.*  Furthermore, "[the] consultant opined [Mr. Kestner] would be able to understand, remember, and carry out simple level work at two-hour intervals in a non-public setting, could maintain concentration, and could adapt to work settings." *Id.*  The ALJ also pointed out that in March 2011, another State agency psychological consultant reached the same conclusions. *Id.* The ALJ found "[t]hese limitations [were] supported by [the consultant's] review of the record, including diagnosis of anxiety in May 2009; excitable, nervous and apprehensive affect in April 2010; good performance during the consultative examination in August 2010; and relatively good performance during a September 2010 mental examination." *Id.*  As a result, the ALJ "accorded great weight" to the limitations described above. *Id.*

To conclude, the ALJ noted that "[i]n addition to these State agency opinions, [Mr. Kestner] also underwent a consultative examination of his mental symptoms in August 2010." *Id.*  Based on the opinion of Dr. Jacklyn Chandler, "[Mr. Kestner] would be capable of adapting to changes in routine work settings." *Id.*  Furthermore, during the evaluation itself, "[he] was able to maintain attention, concentration, and pace." *Id.*  The ALJ, however, acknowledged that according to Dr. Chandler, "[Mr. Kestner] would be moderately impaired in his ability to interact appropriately with the public, coworkers, and supervisors based on his behavior during the examination and reported psychiatric history." *Id.*  But while the ALJ gave some weight to Dr. Chandler's opinion, he found that "the record as a whole, including the opinions of the State agency consultants, the testimony of the claimant, and his father suggest greater limitation to no more than simple, routine, and repetitive tasks." *Id.*  Finally, given that "[Mr. Kestner's] testimony suggest[ed] an ability to interact with those familiar to him but difficulty with strangers," the ALJ "[found] it appropriate to limit [Mr. Kestner's] interaction with the public, but not his interaction with co-workers or supervisors who would be familiar to him." AR 28-29.

### 4. Mr. Kestner Could Not Return to Previous Employment

Having reviewed the record, "[the ALJ found] the claimant has past relevant work as defined in Social Security Ruling 82-62." AR 29.  As characterized by the vocational expert, Mr. Kestner had

worked as a security guard,[15] construction worker,[16] and home attendant.[17]  *Id.*  The ALJ determined "Mr. Kestner's prior work was within fifteen years of the alleged onset date and his actual duration for these positions exceeded the durational requirements of Social Security Ruling 82.62." *Id.*  The ALJ also noted "the evidence indicates [Mr. Kestner's] earnings activity for these jobs exceeded the substantial gainful activity requirements for the relevant time period." *Id.*  As a result, the ALJ found "[Mr. Kestner's] positions as a security guard, construction worker, and home attendant meet the requirements for past relevant works." *Id.*  Based on the VE's testimony that a hypothetical person with the ALJ's proposed RFC "would not be able to perform the [Mr. Kestner's] past relevant work," the ALJ concluded that Mr. Kestner "is not able to perform these positions." *Id.*

### 5.  *Mr. Kestner Had the RFC to Perform Other Jobs in the National Economy*

Having considered Mr. Kestner's age, education, work experience, and RFC, the ALJ found that "there are jobs that exist in significant numbers in the national economy that [Mr. Kestner] can perform." AR 30.  In reaching this conclusion, the ALJ first explained the regulatory criteria for determining whether a claimant can successfully adjust to other work.  *Id.*  The ALJ then noted that "[Mr. Kestner's] ability to perform work at all exertional levels was compromised by non-exertional limitations." *Id.*  He referred back to the hypothetical he posed to the VE regarding "whether jobs exist in the national economy for an individual with claimant's age, educational, work experience, and [RFC]." *Id.*  In response, the VE testified that given all of these factors, such an individual could work as an Assembler[18] or Table Worker.[19]  *Id.*  According to the vocational expert, there are approximately 239,550 assembler jobs nationally and 1,920 locally.  *Id.*  As for the table worker position, there are 430,450 jobs nationally and 4,160 locally.  *Id.*  The ALJ determined that the

---

[15]  Security Guard: DOT No. 372.667-034, Light Exertional Level, Semi-skilled, SVP 3

[16]  Construction Worker: DOT No. 869.687-026, V. Heavy Exertion Level, Unskilled, SVP 2

[17]  Home Attendant: DOT No. 354.377-014, Medium Exertion Level, Semi-skilled, SVP 3

[18]  Assembler: DOT No. 734.687-018, Sedentary Exertional Level, Unskilled, SVP 2

[19]  Table Worker: DOT No. 739.687-182, Light Exertional Level, Unskilled, SVP 2

UNITED STATES DISTRICT COURT
For the Northern District of California

1   vocational expert's testimony is consistent with the information contained in the Dictionary of

2   Occupational Titles.  *Id.*

3        Based on the vocational expert's testimony, the ALJ concluded that a finding of "not disabled"

4   was appropriate as Mr. Kestner was capable of adjusting to other work that exists in significant

5   numbers in the national economy.  *Id.*  The ALJ thus concluded that Mr. Kestner was not disabled

6   under the Social Security Act from January 1, 2009 to the date of the ALJ's decision.  AR 31.

7                                                   **ANALYSIS**

8   **I. STANDARD OF REVIEW**

9        Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

10   Commissioner if the plaintiff initiates the suit within sixty days of the decision.  District courts may

11   set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error

12   or are not supported by substantial evidence in the record as a whole."  42 U.S.C. § 405(g); *Vasquez*

13   *v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted).  "Substantial evidence means more

14   than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind

15   might accept as adequate to support a conclusion."  *Andrew v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.

16   1995).

17        If the evidence in the administrative record supports both the ALJ's decision and a different

18   outcome, the court must defer to the ALJ's decision and may not substitute its own decision.  *See*

19   *id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).  A district court may make a

20   disability finding, even when the agency did not, if (1) the ALJ failed to provide legally sufficient

21   reasons for rejecting challenged evidence, (2) there are no outstanding issues that must be resolved

22   before a determination of disability can be made, and (3) it is clear from the record that the ALJ

23   would be required to find the claimant disabled were the evidence in question credited.  *See Benecke*

24   *v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).

25   **II. APPLICABLE LAW**

26     **A. Five Steps to Determine Disability**

27        An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical

28   or mental impairment which can be expected to result in death or which has lasted or can be

UNITED STATES DISTRICT COURT
For the Northern District of California

1   expected to last for a continuous period of not less than twelve months," and (2) the "impairment or

2   impairments are of such severity that he is not only unable to do his previous work but cannot,

3   considering his age, education, and work experience, engage in any other kind of substantial gainful

4   work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A) & (B).

5        There is a five-step analysis for determining whether a claimant is disabled within the meaning

6   of the Social Security Act.  *See* 20 C.F.R. § 404.1520.  The five steps are as follows:

7        **Step One.**  Is the claimant presently working in a substantially gainful activity?  If so, then the
         claimant is "not disabled" and is not entitled to benefits.  If the claimant is not working in a
8        substantially gainful activity, then the claimant's case cannot be resolved at step one, and the
         evaluation proceeds to step two.  *See* 20 C.F.R. § 404.1520(a)(4)(i).

9
         **Step Two.**  Is the claimant's impairment (or combination of impairments) severe?  If not, the
10       claimant is not disabled.  If so, the evaluation proceeds to step three.  *See* 20 C.F.R.
         § 404.1520(a)(4)(ii).

11
         **Step Three.**  Does the impairment "meet or equal" one of a list of specified impairments
12       described in the regulations?  If so, the claimant is disabled and is entitled to benefits.  If the
         claimant's impairment does not meet or equal one of the impairments listed in the regulations,
13       then the case cannot be resolved at step three, and the evaluation proceeds to step four.  *See* 20
         C.F.R. § 404.1520(a)(4)(iii).

14
         **Step Four.**  Considering the claimant's RFC, is the claimant able to do any work that he or she
15       has done in the past?  If so, then the claimant is not disabled and is not entitled to benefits.  If the
         claimant cannot do any work he or she did in the past, then the case cannot be resolved at step
16       four, and the case proceeds to the fifth and final step.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).

17       **Step Five.**  Considering the claimant's RFC, age, education, and work experience, is the
         claimant able to "make an adjustment to other work?"  If not, then the claimant is disabled and
18       entitled to benefits.  *See* 20 C.F.R. § 404.1520(a)(4)(v).  If the claimant is able to do other work,
         the Commissioner must establish that there are a significant number of jobs in the national
19       economy that the claimant can do.  There are two ways for the Commissioner to show other jobs
         in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2)
20       by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.  If
         the Commissioner meets this burden, the claimant is not disabled.

21

22   For steps one through four, the burden of proof is on the claimant.  At step five, the burden shifts to

23   the Commissioner.  *See Tackett*, 180 F.3d at 1098**.**

24        **B. Presumptive Disability**

25        At step three, when a claimant's impairment is a listed impairment and the claimant satisfies all

26   of the listing's criteria, the claimant is determined to be disabled and is automatically entitled to

27   benefits without further inquiry.  *See* 20 C.F.R. § 404.1520(d); *Celaya v. Halter*, 332 F.3d 1177,

28   1180 (9th Cir. 2003); *Tackett*, 180 F.3d at 1098.  When a claimant's impairment is explicitly listed

1   in Appendix 1, the impairment will meet the requirements for the listing if it satisfies all the criteria

2   enumerated in the listing including criteria in the listing's introduction and any duration

3   requirements.  20 C.F.R. § 404.1525.  A claimant need only meet one listing in order to be found

4   disabled.  *See O'Connor v. Sullivan*, 938 F.2d 70, 73 (7th Cir. 1991).  An ALJ must adequately

5   explain a conclusion that an impairment does not meet or equal a listing.  *See Murphy v. Comm'r of*

6   *Soc. Sec.*, 423 Fed. Appx. 703 (9th Cir. 2011); *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001)

7   (citing *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990)) (holding boilerplate finding is

8   insufficient to conclude impairment does not meet listing).

9   **C.  The Relative Weight of Medical Opinions**

10   When determining whether a claimant is disabled, the ALJ must consider each medical opinion

11   in the record together with the rest of the relevant evidence.  20 C.F.R. § 416.927(b); *Zamora v.*

12   *Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010).  As a rule, the Social

13   Security Administration favors opinions of treating physicians over non-treating physicians.  *See*

14   *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527).  The Social Security

15   Administration defers to treating physicians because they are employed to cure and have a greater

16   opportunity to know and observe their patients.  *Morgan v. Comm'r of Soc. Sec.*, 169 F.3d 595, 600

17   (9th Cir. 1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).

18   The conclusions of the treating physician are not necessarily conclusive, however.  *Id.* (citing

19   *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) and *Rodriguez v. Bowen*, 876 F.2d 759,

20   761-62 & n.7 (9th Cir. 1989)).  A treating physician's opinion will be given controlling weight, not

21   just deference, if the opinion is "well-supported by medically acceptable clinical and laboratory

22   diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

23   record." *Orn*, 495 F.3d at 631 (quoting 20 C.F.R. § 404.1527(d)(2)).  Ultimately, even if a treating

24   physician's opinion is not given controlling weight, it will be entitled to the greatest weight and

25   should be adopted.  SSR 96-02p at 4 (Cum. Ed. 1996).

26   To reject a treating physician's uncontradicted opinion, the ALJ must state clear and convincing

27   reasons that are supported by substantial evidence.  *See Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194,

28   1198 (9th Cir. 2008).  To reject a treating physician's opinion that has been contradicted by another

UNITED STATES DISTRICT COURT
For the Northern District of California

1   physician, the ALJ must provide specific and legitimate reasons supported by substantial evidence.

2   *Id.* Opinions of non-examining doctors alone cannot provide substantial evidence to justify rejecting

3   either a treating or examining physician's opinion. *See Morgan*, 169 F.3d at 602.

4   **III.  APPLICATION**

5       The onset, treatment, and current status of Mr. Kestner's epilepsy and other impairments evolved

6   over the course of the claimed time period.  Mr. Kestner's medical history is not inconsistent as

7   asserted by the Commissioner; rather, his impairments changed over time, a scenario contemplated

8   by the courts and the Social Security Administration. *See, e.g.*, *Orn*, 495 F.3d at 634.

9       Accordingly, it is helpful to consider Mr. Kestner's disability and eligibility for benefits during

10  three time periods:  (1) from the onset date of January 2, 2009 through December 24, 2010, (2) from

11  December 25, 2010 through June 12, 2011, and (3) from the abatement of his seizures beginning

12  June 13, 2011 to the time of the hearing on March 15, 2012.  These time periods account for (1) the

13  period of time Mr. Kestner was disabled under step four and five of the sequential evaluation, (2) the

14  period of time Mr. Kestner was presumptively disabled, and (3) the period of time when Mr. Kestner

15  was no longer disabled.

16      For the reasons discussed below, the undersigned holds that Mr. Kestner was disabled from

17  January 2, 2009 through June 12, 2011 (the first and second time periods), and that Mr. Kestner was

18  not disabled after June 13, 2011 (the third time period) when his seizures were under control.

19      **A.  Mr. Kestner Was Presumptively Disabled From December 25, 2010 to June 12, 2011**

20          ***1.  The ALJ Provided Insufficient Justifications for His Conclusion That Mr. Kestner's Impairments Did Not Meet or Medically Equal Any Listings***

21

22      The ALJ concluded that Mr. Kestner's "seizure disorder," diagnosed as epilepsy, obesity, and

23  anxiety disorder were severe, but did not meet or medically equal *any* listed impairments when

24  considered individually or in combination.  *See* ALJ Decision, AR 21-22.  The ALJ failed to provide

25  sufficient justifications for such a conclusion.  Despite concluding that Mr. Kestner's impairments

26  did not meet *any* of the listings, the ALJ only provided reasons for why Mr. Kestner's impairments

27  did not meet the listing for mental disorders, listing 12.06.  *See* AR 22-23.  The ALJ did not provide

28  reasons for why Mr. Kestner's impairments did not meet another listing, such as the listing for

UNITED STATES DISTRICT COURT
For the Northern District of California

1    epilepsy, 11.00-11.03.  *Id.*

2         The Commissioner is correct that an ALJ does not have to justify why a claimant fails to meet

3    the criteria for each and every listing.  *See Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir.

4    1990).  Mr. Kestner is not requesting, and the court does not require, such a result, however.  Here,

5    unlike *Gonzalez*, the ALJ failed to justify a decision that Mr. Kestner's impairments did not meet the

6    most obvious and relevant listing, the listing for epilepsy.

7         Additionally, the ALJ could have, but did not conclude that Mr. Kestner's impairments failed to

8    meet a specifically identified listing.  The ALJ propounded that Mr. Kestner did not meet *any*, and in

9    coming to such a broad conclusion, should have provided legally sufficient justifications.  Even if

10   the ALJ had come to a narrowly tailored conclusion as to which listings Mr. Kestner did or did not

11   meet, the ALJ erred and reached a conclusion not supported by substantial evidence.  The

12   conclusion that Mr. Kestner's epilepsy did not meet the listing for epilepsy, encompassed in listings

13   11.00-11.03, is not supported by substantial evidence in the record.

14              ***2.  Mr. Kestner's Epilepsy Met the Listing Criteria***

15        Based on a review of all of the evidence in the well-developed record, the only conclusion

16   supported by substantial evidence is that Mr. Kestner's epilepsy met the listing because

17   nonconvulsive epilepsy is a listed impairment and he satisfied all of the criteria.  The undersigned

18   makes this finding of disability rather than remanding to the ALJ for a determination of whether or

19   not Mr. Kestner met the epilepsy listing because the record is well-developed and would not benefit

20   from further administrative proceedings.

21        Nonconvulsive epilepsy is a listed impairment.  *See* 20 C.F.R. § 404, Subpart P, Appendix 1 at

22   §§ 11.00-.03; *Lewis v. Apfel*, 236 F.3d 503, 512-13 (9th Cir. 2001).  The criteria for nonconvulsive

23   epilepsy include:  (1) a detailed description of a typical seizure pattern, (2) seizure frequency of at

24   least once weekly despite at least three months of treatment, and (3) symptoms including alteration

25   of awareness or loss of consciousness and transient postictal manifestations of unconventional

26   behavior or significant interference with activity during the day.  *See id.* at  § 11.03.

27        Mr. Kestner was diagnosed with *and* manifested seizures and symptoms of epilepsy including

28   convulsive epilepsy, grand mal seizures, and nonconvulsive epilepsy.  *See* AR 251, 263, 265, 271,

UNITED STATES DISTRICT COURT
For the Northern District of California

1    273, 328, 347, 369, 399, 404, 440, 458, 462, 466, 503, 547, 598, 607-08, 667, 672, 675, 677, 688-89,

2    748-51.

3        Mr. Kestner provided the requisite detailed descriptions of the typical seizure patterns for both

4    his convulsive and nonconvulsive seizures. *See id.* These detailed descriptions include opinions,

5    clinical findings, notes, and test results from treating physicians, including Dr. Tina Shih, as well as

6    an EEG demonstrating neurological activity that is highly probative of epilepsy. *See id.*

7    Additionally, Mr. Kestner had a seizure during an MRI, which was witnessed first-hand and

8    documented by the treating radiologist and other hospital staff. AR 570. This seizure provides

9    further detail and evidence of Mr. Kestner's epilepsy. The record contains substantial evidence that

10   Mr. Kestner's epilepsy met the listing when considering this objective medical evidence alone.

11       In addition to the objective evidence, Mr. Kestner provided corroborative testimony including

12   his own testimony and the testimony of family and friends who witnessed his impairments and

13   symptoms first-hand. AR 426; AR 39-66.[20] Absent articulated reasons, this corroborative subjective

14   testimony must be credited, and further substantiates the conclusion that Mr. Kestner's epilepsy met

15   the listing and that he was disabled.

16       Finally, Mr. Kestner satisfied the duration criteria for nonconvulsive epilepsy. By December 25,

17   2010, Mr. Kestner had complied with the regimen of divalproex prescribed by Dr. Tina Shih for at

18   least 3 months. *See* AR 754. Nonetheless, Mr. Kestner still had nonconvulsive seizures. Mr.

19   Kestner's convulsive seizures, occurring once every other month, may not have met the duration

20   criteria of the listing, but his nonconvulsive seizures did.

21       Mr. Kestner's serum levels further substantiate Dr. Shih's opinion that Mr. Kestner complied

22   with his treatment regimen for the requisite amount of time. The ALJ's decision to decide that the

23   serum levels indicated medical noncompliance reflects a crabbed reading of the record and fails to

24   take the treating physicians' contextual notes and opinions into consideration. *See* AR 27, ¶ 2. On

25   _____

26       [20] As discussed in subsection B below, the ALJ's justifications for rejecting this lay and
27   physician testimony were legally insufficient. The undersigned credits this testimony as true, but
     also finds that Mr. Kestner met the listing even when considering just the evidence credited by the
28   ALJ.

1    November 17, 2010, Mr. Kestner's valproate level was 24.6.  AR 603.  While the treating physician

2    in the emergency room indicated this was low, he indicated that Mr. Kesnter had recently started

3    taking Valproex.  *Id.*  Based on this finding, Dr. Shih and the emergency room physician agreed his

4    Valproex dose should be increased.  *Id.*  The emergency room physician listed medical

5    noncompliance in the differential diagnosis.  *Id.*  The very definition of a differential diagnosis is

6    that it is neither conclusive nor exhaustive, it represents a list of possible diagnoses.  Accordingly,

7    the ALJ erred by finding medical noncompliance despite substantial evidence to the contrary.

8        A conclusion of medical noncompliance is not supported by substantial evidence in the record,

9    and is also legally erroneous in this case.  Failure to take medicine is not medical noncompliance per

10   se.  It is justified when a claimant cannot afford treatment or has severe reactions to medicine.  *See,*

11   e.g., *Orn*, 495 F.3d at 625; *Gamble v. Chater*, 68 F.3d. 319, 321 (9th Cir. 1995); *see also Myles v.*

12   *Astrue*, 582 F.3d 672, 677 (7th Cir. 2009).  While the evidence in the record shows compliance,

13   there is also evidence that any medical noncompliance prior to September 2010 was justified

14   because of a period of time where Mr. Kestner was uninsured and the debilitating side effects of the

15   many anticonvulsant medications he tried.  *See* AR 53, 245, 248, 267, 343, 345, 428, 538, 539, 547,

16

17       As articulated in this subsection, a  review of all of the evidence in the record indicates that Mr.

18   Kestner's nonconvulsive epilepsy met the listing criteria.  Accordingly, the ALJ's conclusion that

19   Mr. Kestner's individual or combined impairments did not meet or equal the listing criteria was not

20   based on substantial evidence.  Based on the conclusion that Mr. Kestner met the listing for

21   nonconvulsive epilepsy, the undersigned finds that Mr. Kestner was presumptively disabled from

22   December 25, 2010 until June 12 2011, well in advance of the March 2011 cut-off.

23       The ALJ's inquiry should have terminated at step three upon a finding that Mr. Kestner met the

24   listing and was presumptively disabled.  Even if the ALJ's step three conclusion had been correct

25   Mr. Kestner was still disabled and eligible for benefits at step four and five of the analysis because

26   the ALJ's RFC determination and step five conclusion were not based on substantial evidence.

27       **B.  Mr. Kestner Was Also Disabled From January 2, 2009 to December 24, 2010**

28       Even if the ALJ had been correct in his conclusion that Mr. Kestner was not presumptively

UNITED STATES DISTRICT COURT
For the Northern District of California

1    disabled at step three, Mr. Kestner was disabled based on step five of the disability determination

2    analysis.  More specifically, to the extent that the ALJ's RFC and step five analysis concluded that

3    Mr. Kestner could have worked at a different job between January 2, 2009 and December 24, 2010

4    and again from December 25, 2010 through June 12, 2011, when he was presumptively disabled, the

5    conclusion was not based on substantial evidence.  The parties do not dispute the ALJ's step four

6    conclusion of Mr. Kestner's inability to return to previous work.

7        **1.   *The ALJ Failed to Incorporate All of Mr. Kestner's Limitations Into the Residual*
            *Functional Capacity Determination***

8

9        An ALJ errs by failing to incorporate all of a claimant's limitations into the RFC determination.

10   *See Valentine v. Comm'r of Soc. Sec.*, 574 F.3d 685, 690 (9th Cir. 2009); *Samples v. Comm'r of Soc.*

11   *Sec.*, 466 Fed. Appx. 584, 586 (9th Cir. 2012).  Here, the ALJ improperly weighed and discounted

12   certain evidence, and on the basis of that skewed evidence, failed to include all of Mr. Kestner's

13   limitations in the RFC.  The ALJ erred.

14        *(a)   The ALJ Improperly Weighed the Treating Neurologist's Testimony*

15       An ALJ cannot simply assume that treating physicians routinely lie to help their patients get

16   benefits.  *See Lester*, 81 F.3d at 821, 832 (9th Cir. 1995); *see also Wentworth v. Barnhart*, 71 Fed.

17   Appx. 727, 729 (9th Cir. 2003).  As discussed above, a treating physician's opinion will be given

18   controlling weight if it is uncontradicted.  *See* 20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  The

19   regulations defer to the opinions of treating physicians, and ALJs may only reject the uncontradicted

20   opinions of treating physicians with clear and convincing reasons based on substantial evidence.

21   *Ryan*, 528 F.3d at 1198.  When an ALJ improperly rejects a treating physician's opinion, it will be

22   credited as true as a matter of law.  *See Lester*, 81 F.3d at 832; *Massey v. Commissioner of Soc. Sec.*,

23   400 Fed. Appx. 192, 195 (9th Cir. 2010); *Ferrando v. Commissioner*, 449 Fed. Appx. 610, 612 (9th

24   Cir. 2011).

25       The ALJ stated that "Dr. Shih's opinion is accorded significant weight," but proceeded to

26   discount it.  AR 27.  Dr. Shih's opinion is uncontradicted by evidence in the record.  Accordingly, it

27   should have been given controlling weight, and should not have been rejected absent clear and

28   convincing reasons based on substantial evidence.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    The only reason the ALJ provided for discounting Dr. Shih's opinion was that it was

2    "inconsistent with [her] overall medical findings." *Id.* That reason is neither clear nor convincing,

3    and is not supported by substantial evidence in the record. The very facts the ALJ references as

4    inconsistent are not inconsistent; rather, they represent the change in Mr. Kestner's symptoms over

5    time. *Id.* As Mr. Kestner's treating neurologist, Dr. Shih's job was to treat his epilepsy, to help him

6    get better. To assert that different findings over time based on an evolving medical condition are

7    inconsistent defies Ninth Circuit precedent and logic. *See, e.g.*, *Christopherson v. Comm'r of Soc.*

8    *Sec.*, 560 Fed. Appx. 631, 633 (9th Cir. 2011).

9    In conclusion, the ALJ erred because he improperly discounted the uncontradicted opinion of a

10   treating physician and failed to give the treating physician's uncontradicted opinion controlling

11   weight. The opinion of Dr. Shih, contained in treatment notes, Dr. Shih's RFC evaluation, or any

12   other form in the administrative record, is credited as true as a matter of law.

13                    *(b)  The ALJ Improperly Rejected Mr. Kestner's Testimony*

14   The ALJ erred by rejecting Mr. Kestner's testimony because there was sufficient objective

15   medical evidence, no evidence of malingering, and the ALJ failed to provide specific, clear and

16   convincing reasons for rejecting the testimony. Where a claimant has (1) presented the requisite

17   objective medical evidence and there is (2) no evidence of malingering, an ALJ may only reject a

18   claimant's subjective testimony about symptoms with (3) specific, clear, and convincing reasons.

19   *See Chaudry v. Astrue*, 688 F.3d 661, 670-71 (9th Cir. 2012). The ALJ must identify the testimony

20   that is not credible as well as the evidence that undermines the complaints. *See Reddick v. Chater*,

21   157 F.3d 715, 722 (9th Cir. 1998).

22   The ALJ stated that based on the evidence, which included objective medical evidence, the

23   claimant's impairments could reasonably be expected to cause the symptoms in question. AR 25.

24   Additionally, the ALJ did not find that there was malingering. Having established the need for

25   specific, clear, and convincing reasons for rejecting Mr. Kestner's testimony, the ALJ's reasons fell

26   short.

27   The ALJ discounted Mr. Kestner's testimony because it was "1) inconsistent with treatment

28   received; 2) out of proportion to the objective clinical findings; 3) internally inconsistent; and 4)

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

inconsistent with daily activities." AR 25.  First, the ALJ merely listed four reasons.  The reasons are not clear and convincing because the ALJ neither explained them nor supported them with any evidence in the record.  The closest the ALJ came to an explanation was the discussion of the broader conclusion that the medical evidence substantiated an RFC with no exertional limitations. AR 26.  That conclusion goes to the overall determination of Mr. Kestner's RFC, however.  It does not explain one of the four bare reasons for rejecting Mr. Kestner's testimony.  Because this court is limited to reviewing the reasons provided by the ALJ, and may not affirm an intermediate conclusion or final disability determination on the basis of reasons not proffered in the ALJ's decision, the undersigned need not guess at what exactly the ALJ meant by the bare list of reasons. The ALJ failed to sufficiently justify his rejection of Mr. Kestner's testimony.

Second, even without guessing at the ALJ's reasoning, reason number four is insufficient on its face.  The fourth reason for discounting the testimony, that Mr. Kestner's testimony was inconsistent with daily activities, is not sufficient.  The Ninth Circuit has repeatedly held that "the mere fact that a plaintiff has carried on certain daily activities does not in any way detract from [his] credibility as to [his] overall disability." *Benecke*, 379 F.3d at 594 (quoting *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001)); *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  Utter incapacitation is not a prerequisite for a finding of disability.  *See Benecke*, 379 F.3d at 594; *Vertigan*, 260 F.3d at 1050; *Fair*, 885 F.2d at 603.  Accordingly, Mr. Kestner's ability to perform some daily activities is not a basis for rejecting his testimony or his claim of disabiltiy.  Mr. Kestner's testimony is credited as a matter of law.

### (c)  The ALJ Improperly Rejected Family Members' Testimony

Lay testimony rejected on insufficient bases is credited as a matter of law.  *See Lester*, 81 F.3d at 834; *accord Howell v. Astrue*, 248 Fed. Appx. 797, 800 (9th Cir. 2007).  Courts have specifically recognized lay testimony about symptoms or impairments, as well as testimony about their impact on a claimant's ability to work, as competent evidence.  *See Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996); 20 C.F.R. §§ 404.1513(d)(4) & (e), 146.913(d)(4) & (e); *see also Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993); *Lewis v. Apfel*, 236 F.3d 503, 511.  "[T]estimony from lay witnesses who see the claimant every day is of particular value." *Smolen v. Chater*, 80 F.3d 1273,

1  1289 (9th Cir. 1996); *see also Jager v. Barnhart*, 192 Fed. Appx. 589, 591 (9th Cir. 2006).  The fact

2  that a witness is a family member is not a basis for rejecting the witness's testimony.  *See*

3  *York-Spann v. Astrue*, 400 Fed. Appx. 207, 208–09 (9th Cir. 2010); *Regenniter v. Commission*, 166

4  F.3d 1294, 1296 (9th Cir. 1999); *Smolen v. Chater*, 80 F.3d at 1289.  An ALJ errs if the ALJ rejects

5  lay witness testimony because it is not supported by objective medical evidence.  *See Massey v.*

6  *Commissioner*, 400 Fed. Appx. 192, 194 (9th Cir. 2010).  Similarly, an ALJ may not reject lay

7  testimony simply because the lay witness has no medical training.  *See Bruce v. Astrue*, 557 F.3d

8  1113, 1115–16 (9th Cir. 2009); *McCutcheon v. Astrue*, 378 Fed. Appx. 649, 651 (9th Cir. 2010).

9       The ALJ rejected the testimony of Adrianna Kestner, Mr. Kestner's ex-wife, and Mike Kestner,

10  Mr. Kestner's father, because of "bias/subjectivity, lack of medically acceptable standards, lack of

11  first-hand observation, and their general inconsistency with the objective medical evidence."  AR 26.

12  All of these reasons are both legally insufficient and factually inaccurate.

13       The first basis for discounting their testimony is bias/subjectivity.  In this context, that amounts

14  to a rejection of lay testimony on the basis of their status as family members, which is a legally

15  insufficient reason.  There is also no factual basis for that assertion because their lay testimony at the

16  hearing is consistent with physicians' notes indicating family members witnessed Mr. Kestner's

17  seizures.  *See* AR 338, 345, 459, 672, 745.  This basis is legally and factually insufficient.

18       The second basis for rejecting family members' testimony is lack of medically acceptable

19  standards.  This amounts to a rejection of the testimony because Mr. Kestner's father and ex-wife

20  have no medical training or cannot substantiate their findings with objective medical evidence.

21  These are lay witnesses, so it is improper to hold them to the standards of a medical expert or

22  testifying physician and to reject their testimony on the basis of a lack of medically acceptable

23  standards.  This basis is also legally and factually insufficient.

24       The third basis for rejecting the family members' testimony is the witnesses' lack of first-hand

25  observation.  This is factually inaccurate.  Both Mr. Kestner's father and ex-wife lived with him.

26  AR 672, 745.  Both of them witnessed his seizures.  AR 345, 459, 672, 745.  His father even has

27  video of Mr. Kestner's post-ictal state.  AR 672.  This reason is simply incorrect, and could in no

28  way be based on substantial evidence.

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    The fourth basis for rejecting their testimony, the alleged inconsistency with objective medical

2    evidence, is legally insufficient and untrue as a matter of fact.  The Ninth Circuit has held that lack

3    of support from objective medical evidence is not a legally sufficient basis for rejecting lay

4    testimony. In order to reject lay testimony such as the testimony of Mr. Kestner's family members,

5    the testimony must be in conflict with objective medical evidence.  Identifying inconsistencies,

6    which could be from a lack of support, and failing to identify specific direct conflicts, the ALJ's

7    stated reason is legally insufficient.  Furthermore, as stated previously, Mr. Kestner's father and ex-

8    wife's testimony is in fact consistent with the objective medical evidence.  Accordingly, even a more

9    illuminating reason, such as a statement by the ALJ that the testimony was in conflict, is factually

10   insufficient because the evidence in the record is not conflicting.

11   The ALJ gave an additional reason for discounting the testimony of Mr. Kestner's father.  AR

12   26.  The ALJ stated that it "does not make logically follow" that Mr. Kestner's father would leave

13   Mr. Kestner alone with his three year old son and 91 year old grandfather if his impairments were as

14   limiting as he claimed.  AR 26.  Whether it was poor judgment or parenting to leave Mr. Kestner

15   alone with a three year old and his 91 year old grandfather is inapposite in the context of the ALJ's

16   inquiry.  This fact alone does not rise to a level sufficient to justify discounting this subjective

17   testimony.

18   Additionally, a closer look at the record demonstrates that, contrary to the ALJ's representation,

19   Mr. Kestner's father did not leave Mr. Kestner to look after the 91 year old grandfather and the three

20   year old, but rather, the 91 year old grandfather was present, along with other house guests, such that

21   Mr. Kestner was never truly alone with his son at the house.  AR 65-66.

22   In conclusion, because the ALJ's justifications for rejecting the testimony of Mr. Kestner and his

23   treating neurologist, father, and ex-wife were legally insufficient, factually inaccurate, and lacking a

24   foundation in substantial evidence, the undersigned finds the ALJ erred and credits the testimony as

25   true as a matter of law.

26   ### 2. Further Proceedings to Correct RFC Are Unnecessary

27   Typically, an ALJ's failure to include all of a claimant's limitations in the RFC leads to an error

28   at step five of the sequential evaluation process.  This is because the hypotheticals given to the

1   vocational expert, which are derived from the RFC, will also fail to include the improperly excluded

2   limitations.  *See, e.g.*, *Valentine*, 574 F.3d at 690; *see also Hill v. Astrue*, 698 F.3d 1153, 1162 (9th

3   Cir. 2012) (holding under-inclusive hypotheticals have little evidentiary value in support of finding

4   on claimant's ability to work at other jobs in the national economy).  In that instance, the appropriate

5   remedy is usually remand for a new RFC determination and additional proceedings with corrected

6   vocational hypotheticals.  Here, the court need not remand for additional proceedings because even

7   though the RFC determination was defective, new vocational hypotheticals would not further

8   develop the record.

9       The ALJ's hypotheticals were defective because of the defective RFC, but claimant's counsel

10   elicited sufficient additional testimony from the vocational expert to compensate for the deficiency.

11   More specifically, the vocational expert testified that an individual who had a seizure every other

12   month, and was unable to return to work for one day following the seizure, would be unemployable.

13   AR 69.  The vocational expert also testified that an individual with a moderately impaired ability to

14   interact with supervisors and coworkers, such that the individual was unable to interact with them

15   for one-third of the workday, could not perform assembly worker jobs, jobs the ALJ concluded Mr.

16   Kestner could transition to.  AR 68-69.  This testimony takes into consideration all of Mr. Kestner's

17   limitations, documented at AR 424 and 755-56, even though the RFC did not.  Accordingly, the

18   Commissioner failed to meet her burden at step five, and the conclusion that Mr. Kestner could have

19   found different work is not supported by substantial evidence, including the testimony of the

20   Commissioner's own vocational expert.

21   **C.  Mr. Kestner Was Not Disabled From June 13, 2011 Onward**

22       To the extent that the ALJ concluded that Mr. Kestner was not disabled from June 13, 2011

23   onward, the undersigned affirms the finding of non-disability.  This court cannot conclude that the

24   ALJ's decision for that specific time frame was not based on substantial evidence.  Accordingly, this

25   court must defer to the decision of the ALJ to that extent.  This should not be construed as

26   foreclosing future applications for benefits if the need arises.  Rather, this is a narrow affirmance of

27   the ALJ's decision for the specific time period beginning June 13, 2011 based on the deferential

28   substantial evidence standard of review.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

**IV.  REMAND FOR PAYMENT OF BENEFITS IS APPROPRIATE**

A court's decision to remand for an award of benefits or further administrative proceedings depends on the utility of further administrative proceedings.  *See Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  A district court may remand for an award of benefits without further administrative proceedings if the record is fully developed such that further proceedings would serve no purpose, the ALJ has failed to provide legally sufficient reasons for rejecting evidence including a claimant's testimony or medical evidence, and the ALJ would be required to find the claimant disabled crediting the improperly rejected evidence as true.  *See Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014).

This record satisfies all of the requirements for remand for the immediate award of benefits.  The record is fully developed.  It is replete with objective medical evidence, including corroborative opinions of three different treating physicians, medical tests, the opinions of SSA consulting physicians, and testimony from the claimant and his family.  The ALJ provided legally insufficient reasons for rejecting the opinions and testimony of Mr. Kestner, his treating physician, his father, and his ex-wife.  If credited as true, the ALJ would be required to determine that Mr. Kestner was disabled from January 2, 2009 to June 12, 2011.

**CONCLUSION**

The undersigned remands this matter for an immediate award of benefits.  Further administrative proceedings are not required because the record is fully developed and further administrative proceedings would not be useful.  The ALJ erroneously denied benefits due in part to an unjustified rejection of evidence, but there are no outstanding issues in need of resolution and it is clear from the record that substantial evidence would not support a conclusion other than that Mr. Kestner was disabled from January 2, 2009 to June 12, 2011.  Accordingly, the undersigned **GRANTS IN PART** and **DENIES IN PART** Mr. Kestner's motion for summary judgment, **DENIES** the Commissioner's cross-motion for summary judgment, and **REMANDS** for the immediate award of benefits.

This disposes of ECF Nos. 14 and 19.

**IT IS SO ORDERED.**

Dated:  October 31, 2014

_____
LAUREL BEELER
United States Magistrate Judge

UNITED STATES DISTRICT COURT
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

C 13-04747 LB
ORDER